**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lewis C. BILLINGSLEY, Edith E. Friend,**
**and Harry A. Jaeger, Defendants-**
**Appellants.**

**Nos. 16752–16754.**

United States Court of Appeals,
Seventh Circuit.

March 19, 1971.

Certiorari Denied June 7, 1971.
See 91 S.Ct. 2219.

John E. Angle, Steven L. Bashwiner, Chicago, Ill., for defendants-appellants.

Frank J. Violanti, U. S. Atty., Springfield, Ill., Max J. Lipkin, Peoria, Ill., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, CUMMINGS and KERNER, Circuit Judges.

CUMMINGS, Circuit Judge.

In September 1966, appellants and John R. Birdsell were indicted for mail fraud under Section 1341 of the Criminal Code (18 U.S.C. § 1341). Billingsley, Birdsell and Mrs. Friend were named in all eight counts.[1] Defendant Jaeger was named only in Count Eight. After a six-week jury trial, Billingsley was found guilty on six counts, Mrs Friend on five counts and Jaeger on Count Eight. All three received varying prison sentences, and fines were also imposed on Billingsley and Jaeger.

The indictment charged that commencing in July 1961 the four defendants devised a scheme to obtain funds by false pretenses from persons induced to make investments in seven trusts and three corporations. The evidence showed that Billingsley, Birdsell and Mrs. Friend solicited the funds for the Madrigal process of converting iron ore into steel, for a real estate complex in Denver, Colorado, and for mineral extraction. In soliciting these funds, defendants represented their projects to be nonspeculative and imminently profitable. Funds invested in the projects were administered through seven trusts. By the time of trial, most investors had received no return.

Billingsley was the organizer of these projects and Mrs. Friend was the secretary-treasurer of the various trusts. In 1965, Jaeger became associated with Billingsley to reorganize the trusts into Trans-American Minerals and Expediting Corporation, into which the assets of all the trusts were to be placed.

Dr. Leroy H. Gander, a chiropractor, solicited about $120,000 in investments for the projects from 30 persons. On April 14, 1965, he first commenced cooperating with the FBI in its investigation of these projects. Howard A. Schaad, an associate of Billingsley, was contacted by the FBI in the fall of 1964 concerning Billingsley's Madrigal steel process and defendant Birdsell. On April 14, 1965, he was again interviewed by the FBI and continued to cooperate with that organization thereafter.

In February 1965, plans were begun for the consolidation of all the trusts into Trans-American, with the trust investors to receive shares therein in exchange for their trust receipts. On March 8, 1965, Jaeger and Dr. Gander were named acting president and acting secretary-treasurer of Trans-American, and Jaeger was authorized to secure its incorporation. On March 15, 1965, Jaeger went to the office of attorney Robert M. Magill in Springfield, Illinois, to arrange for the incorporation. Trans-American was chartered later that day. One copy of the charter was then given to Mr. Jaeger and the other copy was placed in a hard-bound corporate record book being compiled by Magill, who also prepared minutes of the first shareholders' and board of directors' meetings, and a voting trust agreement among Jaeger, Billingsley and Schaad. These documents were mailed by Magill to Jaeger at his Chicago office on April 17, 1965, at the direction of Jaeger.

On March 19, 1965, Jaeger was elected president and Dr. Gander secretary-treasurer of Trans-American. Its directors held several meetings. Gander, Schaad and Hugh Olsen endeavored to develop working projects for Trans-American until September 1965. Thereafter Trans-American ceased to operate.

I

■ Defendants first contend that they were not given proper latitude at

---

1. Count Five of the indictment was dismissed by the Government. Birdsell was later granted a severance from the trial because of illness of his counsel.

the hearing on the motion to suppress the records taken from Mrs. Friend's home by Dr. Gander on March 17, 1965, and delivered to FBI agents on April 23, 1965. Defendants claim that Dr. Gander acted unlawfully under directions from FBI agents concerned with investigating these defendants and that the material thus obtained was inadmissible under the Fourth Amendment. Specifically, defendants object to the evidentiary rulings of the trial judge during the examination of Agents McQueen and Wolfarth. Our study of the transcript, however, convinces us that the district court permitted sufficient latitude for defendants to show whether Dr. Gander was acting as an agent of the FBI when he entered Mrs. Friend's home and removed the files.

The record shows by stipulation and by testimony that the FBI commenced this investigation in late 1964 or on January 19, 1965. Although Gander removed the files on March 17, he did not proffer them to the FBI until April 14. Prior to that date, the FBI had not contacted Dr. Gander with respect to this case. Thereafter, at the request of Agent Wolfarth, McQueen removed the records from Gander's residence on April 23. Both McQueen and Wolfarth testified that neither they nor any other law enforcement officer suggested to Gander that he obtain the records.

According to Gander, he had no conversations with the FBI concerning this matter before April 14. He did not discuss it with the FBI at the time of Billingsley's February 24, 1965, check-kiting trial. He also testified that before the April 23rd date on which he delivered the documents to McQueen, the FBI had never questioned him about his connection with defendant Billingsley. He was not interviewed by the FBI until June 29, 1965. At the time he removed the records from Mrs. Friend's home, he testified that he was not under investigation. His first contact with the FBI

about these transactions was on April 14 when he phoned McQueen to tender the files. Neither the FBI nor any state or local law enforcement officer "directly or indirectly" induced him to go to Mrs. Friend's home to obtain the records on March 17. In a telephone conversation with Mrs. Friend in the first week of April, Gander told her that if his examination of the records indicated wrongdoing, he would go to the FBI. He told Billingsley the same thing on March 28 or later.

Defendants complain that they should have been permitted to elicit the exact date the FBI started this investigation. However, they were permitted to show its inception was in late 1964 or no later than January 19, 1965, thus proving their point that it occurred prior to the March 17th file removal.[2] Although the trial judge might have permitted a fuller interrogation of Gander, McQueen and Wolfarth, he permitted defendants to explore their relationship in depth. We cannot say that in sustaining the objections to defense counsel's questions, the trial judge abused his discretion, particularly since answers to these questions were usually contained elsewhere in the suppression hearing record or else were immaterial. He was entitled to believe the consistent testimony of these three key witnesses that the FBI was not involved in the removal of the files from Mrs. Friend's home.

## II

■ Defendants also urge that the trial court should have suppressed the files and records removed by Dr. Gander from defendant Friend's home on March 17, as well as certain documents relating to the incorporation of Trans-American which Dr. Gander removed from defendant Jaeger's office on April 23 and then delivered to the FBI. Defendants object that Dr. Gander removed and delivered these materials to the Government for the sole purpose of assisting their investigation and that our decision in Knoll

2. Since there was testimony and a stipulation to this effect, defendants did not need access to the FBI files to show the inception.

Associates, Inc. v. Federal Trade Commission, 397 F.2d 530 (7th Cir. 1968), required suppression.

The evidence shows that on March 17, 1965, Dr. Gander knocked at the front door of Mrs. Friend's house and was admitted by her son Webb. Gander testified that he was not under investigation on March 17, the date he picked up the files, and his first contact with the FBI about this controversy occurred on April 14, when he offered the files to the FBI. Upon entry, Gander proceeded to the Friend den, which had been serving as an office for the group of trusts involved here. The Trans-American company had been chartered as an Illinois corporation two days beforehand, and defendant Jaeger and Dr. Gander had been serving respectively as its acting president and acting secretary-treasurer since March 8th.[3] Gander explained to Jaeger, then a houseguest of Mrs. Friend, that he was removing the Trans-American files to his own home because they would be more convenient there for the performance of his secretarial duties. Jaeger offered no objection and, in fact, helped carry the four file drawers to Gander's car. Although these files included records of the various trusts, the assets of the trusts were to go to Trans-American. Therefore, there can be no serious contention that Gander removed files unrelated to Trans-American.[4]

After studying the files from time to time for a fortnight, Gander became suspicious of the serious money problems revealed thereby. Consequently, he telephoned FBI Agent McQueen on April 14 and suggested that the FBI pick up the files. They were collected by the FBI on April 23. None of the defendants requested the files back until after they had been delivered to the Government.[5]

Subsequent to his April 14 conversation with the FBI concerning his suspicions, Gander removed from defendant Jaeger's Chicago office the Trans-American hardboard corporate record book and other related documents prepared by the corporation's Springfield, Illinois, attorney Robert Magill. As the then duly elected secretary and treasurer of Trans-American, Gander was entitled to the custody of these materials, and he incorporated them into the files which he kept on the business. Nothing in the record suggests any impropriety in either the fact of removal or the manner in which it was accomplished. No showing was made of any objection by Jaeger to these actions.

In both instances, the evidence sustains the trial judge's conclusion that Gander was authorized to take possession of these materials and did so properly. The record does not support defendants' assertion that Gander acted either at government direction or for the purpose of assisting the investigation. His role as a corporate official and custodian of corporate documents reasonably suggests that he obtained the items presently challenged for purposes quite independent of any assistance they might be to federal investigators. Accordingly, neither Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L. Ed. 293, nor Knoll Associates, Inc. v. Federal Trade Commission, 397 F.2d 530 (7th Cir. 1968), relied upon by defendants, controls the admission of this evidence.

### III

■ ■ Only defendants Billingsley and Jaeger were convicted under Count Eight of the indictment. That count charged them, Birdsell and Mrs. Friend with causing a package to be mailed from Robert Magill to Jaeger in Chicago

---

3. Their appointments were ratified at the March 19th meeting of the Trans-American board of directors.

4. In due course, Gander returned the files that did not concern this controversy.

5. On June 2, 1965, Mrs. Friend wrote Gander to return the files. Although Billingsley testified that he asked Gander to return the files on March 18 and March 28, the trial judge obviously believed the contrary evidence of Dr. Gander.

on April 17, 1965, for the purpose of executing the scheme alleged in the prior counts of the indictment. Magill testified that Jaeger directed him to mail various Trans-American documents from Springfield to Jaeger in Chicago, and that the mailing occurred on April 17th. Defendants assert that this testimony violated the attorney-client privilege.

Assuming that Jaeger, rather than the corporation, was entitled to assert the privilege, the mailing was alleged to constitute an act in furtherance of a criminal scheme. Moreover, the incorporation of Trans-American was proved to be a cardinal part of the scheme to defraud. It is well settled that a client may not claim the privilege where, as here. he seeks legal assistance for illegal ends. Pollock v. United States, 202 F.2d 281, 286 (5th Cir. 1953); Colton v. United States, 306 F.2d 633, 637 (2d Cir. 1962); McCormick on Evidence § 99, p. 201 (1954). Accordingly, the district court correctly admitted the testimony of Magill.

## IV

■ Finally, defendants Billingsley and Jaeger argue that their conviction under Count Eight was improper on the ground that the April 17th mailing of Trans-American documents to Jaeger was not for the purpose of executing a scheme to defraud. The statute purportedly violated by these two defendants of course requires that the mailing be "for the purpose of executing such scheme or artifice" to defraud. 18 U.S. C. § 1341. However, it is sufficient if the scheme to defraud is furthered by the mailing. United States v. Shavin, 287 F.2d 647, 649–650 (7th Cir. 1961). The incorporation of Trans-American was an integral part of the scheme. The mailing was pursuant to Jaeger's instructions and was intended to give him as president possession of the basic corporate documents. The mailing was in connection with the establishment of Trans-American to advance the fraudulent projects undertaken by the trusts.

Nothing more was required under the statute. United States v. Platt, 435 F. 2d 220, 224 (7th Cir. 1970).

The judgments are affirmed.