**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Eugene ZIPERSTEIN, Richard Petrizzi, Marvin Rosenthal, Shuw Ling Chang and Joseph Lentini, Defendants-Appellants.**

**Nos. 77–1863 to 77–1867.**

United States Court of Appeals,
Seventh Circuit.

Heard Feb. 20, 1979.

Decided May 22, 1979.

Rehearing and Rehearing In Banc
July 11, 1979.

---

Raymond J. Smith, Gerald M. Werksman, Frank Oliver, Edward J. Calihan, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., William K. Hedrick and Charles B. Burch, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER, TONE and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

The defendants, all of whom were connected with the ownership or operation of so-called Medicaid mills, were convicted of mail fraud, a conspiracy to defraud the United States, and conducting a criminal enterprise affecting interstate commerce. We find that all of the arguments raised by the defendants are without merit and affirm the convictions.

## I

The defendants operated twenty-eight medical clinics owned by defendant Ziperstein. These clinics, located in Chicago, Illinois, consisted of a number of facilities housing offices for doctors, pharmacists and medical support personnel. The Medicare and Medicaid billing by these organizations was handled by two companies, also owned by Ziperstein, which processed the charges and sold them to factoring companies that ultimately collected from the State of Illinois for their own account.

The purpose of the conspiracy, as established at trial, was to increase by fraudulent means the reimbursements received from the Medicaid program. Specifically, the defendants sought to obtain compensation from the government for services which were performed without any arguable justification or necessity. The trial transcript, exceeding 6000 pages, reveals numerous devices engaged in by the defendants to accomplish this end. Only a

few of these need to be recounted to clarify the nature of the scheme.

The most notable technique employed by the defendants came to be known as the "Garfield Shuffle" ("Garfield" was the name of one chain of clinics). Patients were sent to one or more doctors for unscheduled examinations which bore no relation to the patient's specific complaint before sending the patient for treatment of that complaint. Likewise, laboratory tests, such as x-rays and blood analyses, as well as prescription drugs, were ordered for patients regardless of medical necessity.

Not only were patients subjected to unnecessary drugs and procedures, but also the clinic employed devices to inflate the billing on all procedures performed. For example, two prescriptions were written where one would have sufficed, thereby resulting in a double, flat-rate "professional fee" for the prescriptions. Additionally, laboratory samples were taken in double amounts for a double charge.

Finally, the clinics billed the state for services that were not even performed. Prescriptions, for instance, were dispensed in amounts lower than that specified on the prescription form but the state was billed for the full amount stated. Many prescriptions were also signed in blank so that employees could later fill in larger amounts.

The evidence presented at trial established that all of the convicted defendants were participants in this scheme. In particular, evidence revealed that the defendants had encouraged or, more accurately, pressured clinic personnel to engage in these practices in order to meet specified production quotas. Eugene Ziperstein, principal owner and chief administrative officer of the clinics was sentenced to 30 months in custody and assessed a $10,000 fine. Petrizzi and Lentini, who were administrators of the clinics, were given sentences of a $1,000 fine, one year in custody, and three years on probation. Rosenthal, another administrator, was given the same sentence as Messrs. Petrizzi and Lentini, but it was suspended on condition that he spend six months on work release and the remainder on proba-

tion. Shuw Ling Chang, a supervisor in the pharmacies, was sentenced to three years on probation. Various other defendants were acquitted. The convicted defendants now appeal.

## II

All defendants now urge that their trials should have been severed from the trial of Wu Win-Peng, one of the acquitted defendants. Defendants maintain that Wu's defense was mutually antagonistic to that of the other defendants and that Wu's counsel's courtroom behavior prejudiced their defense.

This circuit has a well-established standard for determining when the claim of "mutually antagonistic" defenses will mandate a severance. Such "mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other. *United States v. Kahn,* 381 F.2d 824, 841 (7th Cir.), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). *See also United States v. McPartlin,* 595 F.2d 1321, 1333, 1334 (7th Cir. 1979). An example of "mutually antagonistic" defenses is presented in *De Luna v. United States,* 308 F.2d 140 (5th Cir. 1962). In *De Luna* one defendant claimed that he came into possession of narcotics only when the other defendant saw the police approach and shoved the drugs into his hands. The other defendant, however, denied having ever possessed the drugs and claimed that they had always been in the possession of the first defendant. In a case such as *De Luna,* where someone must have possessed the contraband, and one defendant can only deny his own possession by attributing possession and consequent guilt to the other, the defenses are antagonistic.

This is completely different from a case, such as the one before us, where one defendant denied participation in a criminal conspiracy while admitting, gratuitously from the viewpoint of his own defense, the existence of a conspiracy. Such a "non-participatory" defendant can be acquitted even though no conspiracy is ultimately deter-

mined to have been in existence. In short, the defendant's non-participation adds nothing to the characterization of the acts in which the other defendants participated. Accordingly in *United States v. Hutul,* 416 F.2d 607 (7th Cir. 1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970), the denial of severance was upheld in a case where one defendant claimed that the misrepresentations with which he was charged were made in reliance on statements made by the other defendants and that therefore he lacked the requisite intent to defraud proscribed by the mail fraud laws. In *Hutul* we noted that this simple antagonism of defenses did not automatically require severance. *Id.* at 620. Certainly the fact of reliance by one defendant does not mandate any finding that the statements by the other defendants were made with the requisite intent to defraud. Similarly, in this case, the alleged non-participation of defendant Wu in any conspiracy did not mandate any conclusion, regardless of Wu's statements to the contrary, that an illegal conspiracy in fact existed.

▌Of course, even if the nature of the defenses themselves did not require a severance, it is still possible that the defendants could have been prejudiced by the actual conduct of a co-defendant's defense. *See United States v. Sacco,* 563 F.2d 552 (2d Cir. 1977).[1] This ground for severance, however, depends on a careful evaluation of facts elicited, prejudicial tendencies, and the entire course of the trial prior to the challenged conduct. Such determinations are uniquely within the province of the trial court, and accordingly it is well established that a trial court's denial of a motion for severance will be overturned only if it was an abuse of discretion. *United States v. Tanner,* 471 F.2d 128, 137 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). Examining each instance of alleged prejudice we are unable to find any abuse of discretion.

The defendants first allege that undue prejudice resulted from several remarks in Wu's counsel's opening statement. Two unindicted co-conspirators had been murdered before trial. Judge Will determined that the manner of their death was irrelevant to any issue in the trial and directed counsel to make no mention of their deaths. Nevertheless, Oliver, Wu's counsel, made such a reference in his opening statement. However, he did not mention that the deaths were the result of a murder, and thus we fail to see any prejudice. In another remark in his opening statement, Oliver mentioned that his client was going to take the stand, since "an innocent man almost invariably is eager to take the witness stand." Oliver did not speculate as to whether any of the other defendants were going to refuse to take the stand. Accordingly, these statements clearly fit within our holding in *Hutul* that such remarks are merely an attempt to bolster the credibility of the testifying defendant, not to comment prejudicially upon the silence of the others. 416 F.2d at 621–22. *See also United States v. Barney,* 371 F.2d 166 (7th Cir. 1967). Finally, Oliver intimated that certain other de-

---

1. It is on this ground that we distinguish *United States v. Johnson,* 478 F.2d 1129 (5th Cir. 1973), relied on by defendants as supporting the proposition that where one defense, although not mutually antagonistic, tends to implicate the other defendants, severance is required. In *Johnson,* the Fifth Circuit held that the trial court abused its discretion in failing to grant severance of two defendants in a counterfeiting case, one of whom defended on the ground that he believed himself to be acting as a state police informer when he admittedly received the counterfeit bills from his co-defendant and that therefore he lacked the requisite intent. As we have pointed out in the text, mere antagonism is not enough to compel severance. In *Johnson* there was only this antago-nism since the jury, even if it believed one of the defendants was an informer, need not by virtue of that also find that the co-defendant in fact passed the bills or knew them to be counterfeit. However, the *Johnson* court did not rely on this conflict alone to justify the necessity of severance and was careful to point out that prejudice occurred in the actual conduct of the defense at trial. The court emphasized that the alleged "informer" took "every available opportunity" to incriminate his co-defendant. Certainly even a defense which was not mutually antagonistic could be asserted in such a way as to prejudice the defendant. However, as the rest of this section demonstrates, we find no such prejudice to have actually occurred in this case.

fendants had attempted to tamper with witnesses. This statement was not prejudicial because there was a factual foundation to support the statement. The government offered to prove that one witness was approached by defendant Ziperstein who told her to take the Fifth Amendment before the grand jury and pointed out to her that the government could take her children away. *Cf. United States v. Akin,* 562 F.2d 459 (7th Cir. 1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978) (belief that evidence would be adduced at trial sufficient to justify reference in opening statement).

The defendants also argue that Oliver's conduct of the cross-examination of government witnesses resulted in prejudice. The objections need not be specifically detailed since they all possess a common characteristic: each of these questions was allegedly prejudicial because they reiterated some point which the government had already made concerning the conspiracy. For example,[2] Robert Wessel, a state employee for the Illinois Medicaid program was called by the government to describe the state management of the Medicaid program with regard to billing and benefits. In the direct examination the government asked detailed questions designed to elicit from Mr. Wessel a description of medical services that would not be compensable by Medicaid or would be in violation of applicable regulations. Tr. at 125–29. For example, the following testimony was elicited after the government inquired as to the state's procedure for verifying Medicaid claims:

Q. Prior to payment for a physician's services, does the Department of Public Aid make any investigation as to whether or not that physician's services were medically necessary?

. . . . .

A. No, ma'am.

Q. Prior to payment does your department make any investigation as to whether the services billed were actually rendered?

A. No, ma'am.

Q. Prior to payment for prescriptions, does the Illinois Department of Public Aid verify whether or not the drug or over-the-counter item was actually dispensed?

A. No, ma'am.

Q. Or whether the quantities appearing on a prescription were actually dispensed?

. . . . .

A. No.

. . . . .

Q. Prior to payment do you determine whether or not the pharmacy used a prescription that was presigned in blank by a doctor?

A. No, ma'am.

Clearly this line of questioning prefigured every violation which the government intended to prove. Likewise Wu's counsel's questions centered on virtually the same types of violations:

Q. And you just plain don't have the personnel to run out and check everybody, do you?

A. No, sir.

Q. Your department, I suppose, would have some objection to paying for duplicate treatment on one individual, is that right?

. . . . .

A. We would object.

. . . . .

Q. But you wouldn't necessarily catch that every time it happened, would you?

A. No, sir.

. . . . .

Q. You pay for blood tests made on patients, don't you?

A. Yes, sir, if they are ordered by a physician.

Q. But you are not authorized to pay for testing of employees of various health

---

**2.** Defendants Ziperstein and Lentini themselves emphasize the typicality of this example: "We cite this incident at length because it is typical. Citation of similar incidents will be radically shortened." Brief for Defendants Ziperstein and Lentini at 8 n.1.

centers, who are not bona fide patients, are you?

A. If they are not recipients, no, sir.

Q. You folks wouldn't know from looking at the billings that were sent to you, if the doctor prescribed drugs in a certain quantity, and the pharmacist, in fact, delivered drugs in a lesser quantity, you wouldn't know about that, would you?

Mr. Nash: Objection. Irrelevant, your Honor.

The Court: No, overruled.

Mr. Oliver continued, asking questions about the state's policy on forged prescriptions or pharmacists' sales of public aid eligibility cards ("green cards") obtained while filling prescriptions and never returned to proper owners. Co-defendants' counsel objected, arguing that Mr. Oliver had to make an offer of proof as to these incidents. Mr. Oliver declined to offer any such proof himself, arguing that he expected these incidents to be tied into later proof by the government. The court sustained the objections.

It takes a vivid imagination to conceive any possible prejudice to the co-defendants in this colloquy. With the exception of Mr. Oliver's questions as to forged prescriptions and green cards, every matter had been already addressed or alluded to in the government's direct examination. The government actually offered extensive proof later that prescriptions had been forged. (Tr. 957, 972, 1207–12, 2160–64, 2315–16, 2393–94, 2723–24, 3393–94, 3569–71). Whatever harm accrued to the defendants was the legitimate incrimination which this evidence produced, and we cannot see that the mere reiteration of properly detrimental evidence creates any unfairness proscribed by the Due Process Clause. As to the reference to green cards, it is sufficient to note that the court immediately thereafter sustained defendants' objections, thereby minimizing to acceptable levels any prejudice from such unsubstantiated allegations. An examination of all the remaining allegations of prejudice from Oliver's cross-examination reveals that these allegations rely on the defendants' incorrect theory that reiteration of evidence which the government legitimately produced was detrimental.

Defendants finally claim prejudice from Oliver's closing statement. Again they appear to be complaining only that Oliver was repeating allegations made by the government. Oliver did assert that the clinics were places where "really bad medicine" was practiced and where patients were given wrong drugs and treatments. The record, however, is replete with legitimate and proper evidence that these clinics were staffed by unqualified and unlicensed personnel (Tr. 491, 972, 2817); that unnecessary treatments were prescribed (Tr. 447, 638–40, 698G, 975, 1185, 1970–71, 2008–10, 2089, 2092, 2452, 2775, 3525, and 3544–51); and that needed prescriptions would be underfilled (Tr. 1212). Likewise, calling Ziperstein and Lentini "conspirators" or "vile and despicable men" differed little from the pictures of them painted by the government.

In sum, we cannot say that the defendants have pointed to sufficient incidents of prejudice to mandate a conclusion that they received an unfair trial. Thus, we refuse to set aside the appropriately exercised discretion of the trial court.

### III

■ Defendant Ziperstein argues that the trial court committed error by admitting certain pharmaceutical records showing prescriptions signed in blank, which were turned over to the government by Harlan Eisentraut, a pharmacist in Ziperstein's employ. Ziperstein characterizes these records as "stolen" and argues that alleged government encouragement of this "theft" violated the Fourth Amendment, thereby requiring suppression of these records. Since we do not believe that Ziperstein has correctly characterized the means whereby Eisentraut obtained control over these records, we find no merit in Ziperstein's argument.

The evidence relevant to this argument established that from September 1975 to

July 1976 Harlan Eisentraut was employed as a pharmacist in three pharmacies operated by Ziperstein. Shortly before Eisentraut left the Ziperstein pharmacies at the end of July 1976, Eisentraut called FBI Agent Kelly and told him that he had knowledge and evidence of wrongdoing. Specifically, he said that on some "prescriptions [he] had filled, the quantities or integrity had been increased" and that he "found . . . quite a supply of signed Welfare prescriptions not dated by one or probably three different doctors." These documents were in a storage room in the clinic. Agent Kelly expressed an interest in them, and two days later Eisentraut brought the documents to the FBI. Included in the documents were prescriptions filled by Eisentraut himself, prescriptions filled by others before Eisentraut began work in the clinics, and about 200 pre-stamped prescriptions. The FBI directed Eisentraut to return some of the documents which it believed did not indicate any criminal conduct; the remainder of the documents were offered as government exhibits at trial.

The trial court admitted these exhibits over defense objections. The trial court ruling was premised on its findings that Eisentraut gained possession of the documents before his contact with the FBI, that he came into possession of these documents through legitimate means, and that Eisentraut decided to turn over the documents to the FBI on his own volition without any inducement from the FBI. We affirm this ruling of the trial court on the alternative grounds that the defendant did not have a legitimate expectation of privacy in the documents and that no government participation in the removal of the documents was established. Therefore no Fourth Amendment violation occurred.

It must be initially emphasized that in determining the validity of Ziperstein's Fourth Amendment claim the laws relating to ownership, custody and theft as well as other incidents of property law are not particularly relevant to this inquiry. We are not concerned with determining whether these documents are properly characterized as "stolen." The Fourth Amendment clearly countenances numerous seizures where the items seized are taken without the express consent of the owner. Instead, the Fourth Amendment inquiry focuses on whether the owner had a reasonable expectation of privacy with respect to the seized items. If no such expectation exists, the taking cannot run afoul of the Fourth Amendment.

We do not believe that any such reasonable expectation existed in this case. The Supreme Court recently noted that "[w]hat [employees] observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy," and accordingly employee disclosures were said to be beyond the purview of any Fourth Amendment restraints. *Marshall v. Barlow's Inc.,* 436 U.S. 307, 315, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978). Certainly pharmaceutical prescriptions come within the daily observation of a pharmacist and were beyond any reasonable expectation of privacy which Ziperstein had. An identical result was reached by this circuit in *United States v. Billingsley,* 440 F.2d 823 (7th Cir.), *cert. denied,* 403 U.S. 909, 91 S.Ct. 2219, 29 L.Ed.2d 687 (1971). In *Billingsley,* documents relating to the incorporation of a business entity were removed by one of the corporate officers from the office of one of the convicted defendants. We upheld the government's use of these documents in a mail fraud trial, noting:

> As the then duly elected secretary and treasurer of Trans-American, Gander was entitled to the custody of these materials, and he incorporated them into the files which he kept on the business. Nothing in the record suggests any impropriety in either the fact of removal or the manner in which it was accomplished.

*Id.* at 826. There is similarly nothing to suggest any impropriety in a pharmacist obtaining control over the the records which serve as the basis of his daily activities. This is in clear contrast to the evident improprieties in the cases relied on by the defendant. For instance, in *Knoll Associates, Inc. v. FTC,* 397 F.2d 530 (7th Cir.

1968), the documents obtained were apparently not related to the duties of the employee who took them and the court, therefore, repeatedly characterized them as "stolen." In *United States v. Stein,* 322 F.Supp. 346 (N.D.Ill.1971), the documents were obtained by a co-tenant in the defendants' office who never asserted that he had any legitimate access to the documents but only that they had been "abandoned" by the defendants.

 Even were we to believe that Eisentraut had no authority to obtain control over the documents and that Ziperstein had a reasonable expectation of privacy with respect to them, we could not grant the motion to suppress. Even where there is evident impropriety involved in obtaining the documents, it still must be determined whether the government was involved in the impropriety. In *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) private detectives burglarized the defendant's office and blew open a safe at the behest of a former employee of the defendant. The Supreme Court upheld the admission of the documents noting that "the record clearly shows that no official of the federal government had anything to do with the wrongful seizure of the petitioner's property." 256 U.S. at 475, 41 S.Ct. at 576. The district court found in this case that Eisentraut gained possession of the documents before contacting the government and that he turned them over without government inducement. We do not understand Ziperstein to challenge these findings. Instead he seeks to construe the government's acceptance of the documents as ratification and cooperation in the taking. Such a position does not however accord with *Burdeau.* There the government accepted documents it knew to have been improperly removed from the defendant's offices and the court clearly held this "participation" to be insufficient to invoke the restraints of the Fourth Amendment. Accordingly, we believe the district court was correct in its denial of Ziperstein's motion to suppress.[3]

## IV

Defendants also argue, relying on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that their Due Process rights were prejudiced by the government's alleged concealment of favorable material. This claim originates from the government's direct examination at trial of laboratory personnel who claimed that they had participated in or knew of actions by defendants to increase lab test and pharmacy revenues. One witness, Drena Jordan, testified that she had altered 75 percent of the prescriptions written by doctors in the clinic where she worked. When the defendants objected, the court required the government to produce the altered documents. Upon production of the documents,[4] it became apparent that the 75 percent figure was inaccurate, since only 100–200 prescriptions visibly indicated any alterations, and thus the trial judge instructed the jury to disregard the witness's recollection of the 75 percent alteration figure. Other witnesses testified that they had added unnecessary tests to laboratory requisition forms. Although not one of the defense attorneys objected to the alteration testimony as it was elicited, the trial judge (apparently on a subsequent suggestion of one of the defense counsel) indicated that he felt that the best evidence rule might require the

---

3. We also note that the government's use of this evidence can be justified under the Fourth Amendment on a consent theory. In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the court held that one having "joint access or control for most purposes" could consent to a search of the jointly controlled goods or premises. Employees, like Eisentraut, possess sufficient control over items relating to their employment to consent to those searches. *See, e. g., United States v.*

*Piet,* 498 F.2d 178 (7th Cir. 1974) (validating employee consent to search warehouse containing stolen goods).

4. The original prescriptions were last known to have been in the possession of defendant Ziperstein who, despite the government's subpoena, never produced them. During trial copies of these prescriptions were obtained from one of the clinics and were then made available to the defendants.

production of the altered documents. The government responded by saying that these documents would be of no value since the witnesses could not tell from the face of the documents which tests were the added unnecessary ones. The trial court ultimately ruled that although it would not strike the prior testimony, as to which there had been no contemporaneous objections, it would strike any further similar testimony without the introduction of the related documents.

▇▇▇▇ The perimeters of the defendants' *Brady* argument are not entirely clear from their briefs. Certainly there can be no *Brady* claim as to the documents themselves since, except for those in the sole possession of some of the defendants, the government made all of them available to the defendants well before trial. The fact that the government did not introduce them itself at trial does not, as defendants seem to imply, implicate the principles of *Brady* as long as the documents were made available to the defendant. Those documents in the possession of some of the defendants, specifically the pharmaceutical records mentioned in Drena Jordan's testimony, were obtained and made available to the other defendants during trial. We reiterate that *Brady* does not require pretrial disclosure. As long as ultimate disclosure is made before it is too late for the defendants to make use of any benefits of the evidence, Due Process is satisfied. *United States v. McPartlin,* 595 F.2d at 1345–1347 (7th Cir. 1979). Here all witnesses remained available for recall to the stand to be confronted by these documents, a procedure which the defendants declined to follow. No other specific claims of prejudice from the timing of the disclosure is even suggested by the defendants, and indeed it is difficult to imagine what sort of prejudice might have existed.

▇▇ Another strain of the defendants' argument concerns not the government's disclosure of the laboratory requisition documents themselves but the allegedly inadequate disclosure of extrinsic facts about the documents. The defendants argue that the government did not disclose the fact that these documents would diminish the credibility of the witnesses, specifically that the witnesses had been unable to identify the added tests when shown the documents. Although the damaging character of the laboratory requisition documents is subject to serious question,[5] it is obvious that ultimate disclosure of the possibility that the document would impeach the witnesses was made before the close of the trial. Since the defendants did not attempt to develop themselves any impeaching inferences from the documents, we cannot say that the government's timing of this disclosure caused any prejudice.

## V

Defendant Ziperstein also argues that Pepa, a government witness, was permitted to give highly prejudicial, inadmissible testimony. Pepa worked as a physician for six months in 1972 in a medical center which housed a Ziperstein-operated pharmacy. Pepa testified at trial that shortly after he began at the medical center Ziperstein told him that he should write three to four prescriptions per patient and that Pepa should endeavor to write prescriptions for more expensive drugs than might be necessary. Pepa further testified that on one occasion he had signed blank prescriptions at Ziperstein's request.

On cross-examination, however, Pepa admitted that he had previously told the FBI that he had done nothing wrong while employed by Ziperstein. Before the government's rehabilitation of Pepa on re-direct, the court examined Pepa outside the presence of the jury to determine the reasons

---

**5.** The addition of tests to the laboratory requisition forms, unlike the alteration of prescription forms, did not involve making any changes that would be visible on the face of the documents: another test was simply checked off on the form. The fact that witnesses could not recall from seeing such a document, which was merely one of thousands of similar documents, which tests were added by them neither impeaches nor corroborates their recollection that they added unnecessary tests to forms as a regular practice.

for the inconsistency in his statements. Pepa explained that at the time he spoke to the FBI he had been frightened of what Ziperstein would do to him or his family if he told the truth. Pepa substantiated this fear to the court by recounting several threatening incidents. At one time Pepa had warned Ziperstein that he was considering sending his patients to another pharmacy to have their prescriptions filled. Ziperstein responded, stating: "Don't touch those patients. If you do, then God help you." Pepa also testified that after he left his association with Ziperstein, his new office was vandalized and that he believed Ziperstein was responsible. After hearing this testimony, the judge ruled that Pepa could explain to the jury the state of mind which caused him to make the inconsistent statement to the FBI. But the judge also ruled that Pepa should not be permitted to testify as to the reasons for that state of mind—*i. e.,* Pepa could testify that he was afraid of Ziperstein but could not relate the specific incidents that gave rise to those fears.

After this ruling, Pepa returned to the stand, and the following colloquy occurred:

Q. Mr. Pepa, why did you lie to the FBI?

The Court: In 1975?

By Mr. Johnson:

Q. Yes, December, 1975.

A. I was scared.

Q. What were you scared of?

Mr. Smith: I object, your Honor.

By The Witness:

A. I was scared—

The Court: Overruled.

By The Witness:

A. I was scared of the safety of my family.

By Mr. Johnson:

Q. Is there anyone specifically you were scared of?

Mr. Smith: I object.

The Court: Sustained.

■ The arguments by defendant Ziperstein that he was prejudiced by this interchange border on the frivolous. The defendant argues that this testimony was improper on two grounds. First, Ziperstein contends that the issue of Pepa's fear had only marginal relevance to the case and that any such relevance was outweighed by the prejudice which it would have on Ziperstein. This court has previously held that witnesses may properly avoid the impeaching effect of prior inconsistent statements by testifying that those statements were made in fear of retaliation by the defendant. *United States v. Pritchard,* 458 F.2d 1036 (7th Cir.), *cert. denied,* 407 U.S. 911, 92 S.Ct. 2434, 32 L.Ed.2d 685 (1972). Further, the court sensitively exercised its discretion in limiting the prejudicial effect of this testimony both by prohibiting inquiry into the specific incidents and by giving a limiting instruction to the jury admonishing them to consider the evidence only as proof of Pepa's state of mind and not as proof of any conduct of Ziperstein.

■ Ziperstein also asserts that he was prejudiced by the prosecutor's question asking Pepa who had frightened him. Ziperstein argues that his question personally linked him to Pepa's fear which the trial judge had ruled impermissible. However, Pepa never testified before the jury that he was afraid of Ziperstein and the objection to this question was sustained before the witness could answer it. Any link between such an unanswered question and any beliefs that the jury had about Ziperstein are simply too tenuous to support a claim of prejudice. Furthermore, even if the jury answered this question in their own minds, the judge had indeed ruled—a ruling supported by *Pritchard*—that the government could establish that Pepa was afraid of Ziperstein. The trial court's ruling only limited the ability of the government to delve into the incidents that served as the basis of that fear. Thus, even if the jury understood this last question as implicating Ziperstein, no impermissible prejudice occurred.

## VI

■ Defendant Ziperstein's final argument is that his conviction cannot stand because it was based on "perjured" testimo-

ny. Several clinic employees testified at trial that Ziperstein had pressured them to add unnecessary tests to requisition forms. These employees had previously testified before the Grand Jury that they had not made any such additions or had given other contradictory testimony. Several of these witnesses admitted on the stand that they had lied to the Grand Jury. Building on this factual basis, Ziperstein contends that *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), requires reversal of a conviction where witnesses whose testimony was necessary to prove an element of the offense were shown to have previously given contradictory testimony under oath. Accordingly, Ziperstein argues, his conviction must be reversed.

We think that Ziperstein has clearly misread *Mesarosh.* In *Mesarosh,* a Smith Act prosecution, it was learned before Supreme court review that one witness who had testified at trial had subsequently given wholly contradictory testimony to a legislative committee. The Solicitor General thus admitted that he had reason to doubt the truthfulness of that witness's testimony and, as a result, asked that the Supreme Court remand the case to the trial court for a determination as to the truthfulness of the witness at trial. The Supreme Court declined to remand for such a determination, stating:

> It might be different if we could see in this case any factual issue upon which the District Court, on a remand, could make an unassailable finding that Mazzei's other falsehoods were differentiated from

his testimony herein. But it is not within the realm of reason to expect the district judge to determine, as the Government indicated it would ask him to do, that the witness Mazzei testified truthfully in this case in 1953 as an undercover informer concerning the activities of the Communist conspiracy, yet concurrently appeared in the same role in another tribunal and testified falsely—possibly because of a psychiatric condition—about a plan by different members of the Communist conspiracy to assassinate a United States Senator.

352 U.S. at 13, 77 S.Ct. at 7. The Court also noted that a remand was not appropriate, since the "district judge is not the proper agency to determine that there was sufficient evidence at the trial, other than that given by Mazzei, to sustain a conviction." *Id.* at 12, 77 S.Ct. at 7. It is clear therefore that the Supreme Court believed the trial testimony to be completely discredited and remanded for a trial without the tainted testimony.

The case before us is completely different. In *Mesarosh* the contradictory statements were made after the testimony at trial and no reason appeared in the record which would explain why a witness once having revealed the truth would then subsequently begin to lie. Indeed, where there are conflicting statements, it is most likely that the falsehood should precede the truth. Here the contradictions preceded the trial testimony, and where those contradictions occurred [6] a credible explanation for why

6. We have carefully scrutinized the record before us to determine the nature and extent of any conflicting testimony. This examination revealed that a large portion of the defendants' claims of perjury reflect a severe distortion of the record, a distortion which often borders on misrepresentation. For example, the defendant argues that Henrietta Wilkins's testimony was inconsistent in that although she testified on direct that she added unauthorized lab tests to requisition forms, on cross examination she admitted that before the grand jury she had denied "that she ever added lab tests." In fact the record shows that her grand jury testimony was that she added tests "a couple of times" and she stated during cross-examination that she had meant the phrase "figuratively" and

thus in a way consistent with her trial testimony. Likewise defendant Ziperstein argues that Ethel Howard had not revealed to the Grand Jury the existence of a conversation about which she testified on direct and the government stipulated this omission before the Grand Jury. In fact the government refused to make such a stipulation, and the record does not otherwise reveal whether Ms. Howard, as she claimed, did in fact communicate the contents of the conversation to the grand jury.

Other "contradictions" cited by the defendant are completely insignificant and may be explained by ambiguities in the cited statements. Mildred Baker's inconsistencies appear to be the product of an understandable confusion between the billing sheets for pharmaceu-

the witness would have initially lied existed. All witnesses who admitted that they had given previous false statements either to the Grand Jury or to Ziperstein's private investigators explained that they did so to avoid possible retaliation by the defendants either by being fired, physically endangered or otherwise disadvantaged.[7] Additionally, some explained that they feared incriminating themselves by revealing their participation in the fraudulent schemes.[8]

Finally, the *Mesarosh* decision depended on its peculiar facts, and did not impair the general rule that even testimony flatly contradictory of the witness's earlier testimony is evidence which the jury can credit and rely upon. *United States v. Tanner,* 471 F.2d 128, 133, 135–36 (7th Cir. 1972).

## VII

Defendant Petrizzi urges that error was committed with respect to the government's treatment of the unindicted co-conspirators. These objections are, at best, inartfully set out thereby leaving ambiguous both the specific actions by the government and the legal theories which underlie the objection. To the extent that we can discern the nature of these objections, however, we find no merit in them.

 One basis of the objection seems to be that unindicted co-conspirators, although not named, were allowed to testify as to conversations among themselves which were conducted outside of the presence of the defendants. To the extent that the co-conspirators (all employees of the defendants) testified as to statements of the defendants or other co-conspirators, these statements are within the party admission exception to the hearsay rule. Fed. R.Evid. 801(d)(2)(D), (E). Furthermore, it is well established that co-conspirators need not be indicted, and *a fortiori* need not be named, for the exception to be applicable. *See, e.g., United States v. Durland,* 575 F.2d 1306 (10th Cir. 1978); *United States v. Pope,* 574 F.2d 320 (6th Cir.), *cert. denied,* 436 U.S. 949, 99 S.Ct. 195, 58 L.Ed.2d 179 (1978); *Joyner v. United States,* 547 F.2d 1199 (4th Cir. 1977). To the extent that the co-conspirators testified as to their own actions and statements this testimony would be admissible and relevant as to other members of the conspiracy. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941); *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). We see no reason to believe, and Petrizzi cites no authority, that naming an unindicted conspirator in the indictment has any effect on the relevancy of that co-conspirator's testimony once the existence of a joint venture is established. Naming the unindicted co-conspirator at most merely conveys a more detailed picture of the government's theory of the conspiracy, and the recent trend of authority has been to subordinate this minor advantage to the greater disadvantage that would accrue to a named

---

tical products and the prescriptions themselves. Ethel Howard who testified as to the lab quota set by the defendants had told the grand jury that there was no quota but that dollar totals for each day's lab work was always kept at a set level—a contradiction more terminological than substantive. Larry Kelly testified as to the addition of unauthorized tests by lab employees, and his grand jury testimony denying that tests were added appears more to mean that no additions were made where they involved performing additional unauthorized procedures on the patients but would be made only where they involved either taking larger quantities of tested material from patients or subjecting that material to more laboratory analysis. Such a position would be completely consistent with the direct testimony. The same distinction would resolve any contradictions in Dorothy Harman's testimony.

Certainly it cannot be said to be unreasonable for the jury to have similarly· resolved these apparent contradictions and thereby to have fully accepted the testimony as credible.

7. Mary Hunt, Larry Kelly, Drena Jordan and Donne Smith all admitted that their fear of losing their jobs motivated them to give prior false testimony to avoid incriminating their employers. Larry Kelly and Donne Smith expressed fear of violent physical retaliation by Ziperstein. Georgia Cole said she believed that Ziperstein could exercise his influence on the FBI to have her children taken away from her once her participation in the fraud was revealed.

8. For example, Donne Smith offered this explanation.

but unindicted co-conspirator who must bear the opprobrium of a criminal accusation without any opportunity to vindicate himself.[9] *United States v. Chadwick,* 556 F.2d 450 (9th Cir. 1977); *United States v. Briggs,* 514 F.2d 794 (5th Cir. 1975); *Application of Jordan,* 439 F.Supp. 199 (S.D.W. Va.1977).

■ The second basis of the defendant's objection is that the trial court read to the jury the list, prepared by the government, of the unindicted co-conspirators. The theory behind this objection appears to be that the reading of the list "amended" the indictment and prejudiced the defendants by leading the jury to believe that there were more witnesses to the defendants' misdeeds than the government had called. Of course the jury was just as likely to infer that these witnesses were not called because they would not support the government's case. In any event, this objection was not properly preserved since no objection was ever made to the reading of the list.

## VIII

Defendants Chang and Rosenthal contend that the government's evidence of use of the mails was insufficient to establish either proof of any violation of the mail fraud statute, 18 U.S.C. § 1341, or to establish venue in the Northern District of Illinois. The evidence presented by the government to show use of the mails centered on the mailing of the fraudulently obtained checks (or "warrants") by the State of Illinois. Glenda Stowers, supervisor of the warrant distribution center in the state comptroller's office, testified that the ordinary practice of her office was to mail checks to those making claims under the Medicaid program. These checks were mailed by stuffing them in an envelope with a golden-colored voucher which showed the same address as printed on the check and could be seen through a window in the envelope. Further, the government introduced into evidence each original warrant and a copy of the corre-

sponding voucher showing the address. These exhibits were obtained from files in the possession of the State of Illinois. Each warrant bore an indorsement from a recipient in Chicago—either that of a factoring company to whom Ziperstein sold his receivables or that of Ziperstein subsidiaries.

■ We think the evidence that the warrants were regularly mailed by the State, and that these warrants were indorsed by the addressees, was sufficient to allow a jury to infer that the mails had been used in the distribution of these warrants. Indeed in *United States v. Joyce,* 499 F.2d 9 (7th Cir. 1974), we held that proof of use of the mails could be made out merely by substantiating a regular business practice of mailing the type of document which served as the basis of the fraud allegations. Here the indorsements supply the additional corroborating factor of receipt of the warrants, thereby making it even more likely that the documents were mailed.

The specific deficiencies of proof urged by Chang and Rosenthal do not alter our conclusion. Defendants Chang and Rosenthal first urge that no regular course of business by the State with respect to mailing was ever demonstrated. To support this argument they cite a portion of Glenda Stower's testimony on cross-examination in which she agreed that the receipt of certain documents and the occurrence of certain other events were prerequisites for the ordinary course of business to be followed with respect to a particular warrant. Although the precise nature of these unspecified events and documents was not revealed in Mrs. Stower's testimony, Chang and Rosenthal urge that since it was never shown that these events occurred, there could be no presumption that the warrants were mailed. This argument, however, extracts too much from Stower's testimony on cross-examination. She never stated that these other documents or events were prerequisites to mailing the checks. Indeed on direct she said that the regular course of

---

**9.** Even this advantage was minimal here since long before trial the government tendered to the defense a list of those persons whom the government considered to be unindicted co-conspirators.

business was that checks, if delivered at all, were delivered by mail. Thus, at most, Mrs. Stower's cross-examination responses can only be interpreted to suggest that these other events are prerequisites to authorizing release of the checks. Since the defendants cannot contest that the checks, all of which bear appropriate indorsements, were released for delivery and can only contest that they were delivered by mail, we do not believe that the failure of the government to prove the occurrence of these unspecified prerequisites was material.

Second, defendants claim that the government failed to invoke the presumption that mail is delivered according to the address displayed thereon. There was testimony that the warrants were addressed by placing the voucher for the warrants in the envelope in such a manner that the address on the voucher was displayed through the window on the envelope. Defendants now claim that the government failed to demonstrate what address was on the vouchers for each warrant. This contention is without any conceivable merit—all vouchers were introduced into evidence and they all bore the same address as the corresponding warrants.

Finally, defendants attack minor inconsistencies in the testimony of two witnesses who testified as to receipt of the warrants. However, since we believe that the government met its burden of proving use of the mails by showing the State's regular procedure of mailing warrants and by showing actual receipt of the checks by virtue of their indorsements it was not even necessary to call any witness to testify as to receipt by mail, and thus we feel that these supposed inconsistencies were immaterial.

Defendants' claim that the government did not establish venue in the Northern District of Illinois is similarly without merit. The defendants argue that the government never established that the street addresses to which the warrants were

mailed were in Chicago. The addresses, however, all designated Chicago, Illinois, as the city of destination. The defendants' claim, thus, at most becomes a claim that the specific street addresses may be non-existent. We think that fact would be irrelevant in establishing venue where the letters were destined for Chicago and, if deliverable at all, were deliverable there. In any event, since this objection was not raised until after the government completed its case, it was waived. *United States v. Fabric Garment Co.*, 262 F.2d 631 (2d Cir. 1958).[10]

Affirmed.

---

10. Rosenthal's attack on the count 65 racketeering conviction was limited to its dependence on the mail fraud convictions. Since we have upheld the latter, the former stands as well.