In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3731

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KYLE KIMOTO,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cr-30089-MJR-1—**Michael J. Reagan**, *Judge*.

ARGUED JUNE 2, 2009—DECIDED DECEMBER 2, 2009

Before POSNER, RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Kyle Kimoto was charged with one count of conspiracy, in violation of 18 U.S.C. § 371, one count of mail fraud, in violation of 18 U.S.C. § 1341, and twelve counts of wire fraud, in violation of 18 U.S.C. § 1343. After a ten-day trial, the jury convicted Mr. Kimoto on all counts. Mr. Kimoto appealed. For the reasons set forth in this opinion, we affirm Mr. Kimoto's conviction and also affirm all aspects of

his sentence except for the district court's enhancement for the number of victims. With respect to this one aspect of Mr. Kimoto's sentencing, we remand to the district court for further proceedings.

# I

## BACKGROUND

Kyle Kimoto was president of Assail, Inc. ("Assail"), a telemarketing firm based in St. George, Utah. In 2001, Assail began marketing a financial package developed by another telemarketing company, Rockwell Solutions ("Rockwell"). The package included a pay-as-you-go debit card,[1] along with other promotional discounts, and was called "First Financial Solutions." After Assail ended its association with Rockwell, it began marketing an equivalent product developed by the Bay Area Business Council ("BABC"), which was owned and operated by Peter Porcelli.[2] Assail also marketed a similar product on its own, under the names Premier One, Advantage Capital and Capital First.

In making cold calls to consumers throughout the United States, Assail used "lead lists" with names of

---

[1] A pay-as-you-go debit card operates like a pre-paid telephone or gift card. The card itself has no value until the user loads funds on it. Unlike a gift card, however, once value has been loaded on the card, it is accepted wherever that particular card company's card (VISA or MasterCard) is accepted.

[2] Porcelli also had marketed the program under the name First American Leisure.

consumers who either had applied for credit and been turned down or had a less-than-perfect credit history. The program was designed to make individuals believe that the call was in response to a recent credit application and that their applications were now being processed or reconsidered. A telemarketer would call the prospective buyer and state: "Our records indicate that within the past 12 months, you filed an application for a credit card and you are now eligible to receive your Visa or a MasterCard." Gov't Ex. 2a. The telemarketer would proceed to ask about the individual's household and monthly income. The customer then would be put on hold for "computer authorization," which consisted merely of the telemarketer placing the individual on hold; no authorization actually was occurring. Tr. V at 18. When the telemarketer returned to the line, he would state: "Mr./Mrs. [Customer Name] based on your information you are guaranteed to receive a MasterCard that does not require a security deposit with an initial pay as you go limit of $2000." Gov't Ex. 2a. The consumer then would be informed that he would be charged a one-time processing fee of $159.95. The consumer was reminded that nothing "looks better on your Equifax credit report than a MasterCard." *Id.*

If the consumer agreed to purchase the package, she was transferred to a "verifier." The processing fee was a one-time debit of the consumer's bank account, based upon oral authorization, and therefore, a recording of the

verification call was made.[3] The consumer heard an automated disclosure mentioning the pay-as-you-go MasterCard and advising that there would be no credit on the card until a payment was made. If consumers asked questions of the verifier, the verifier attempted to give responses that confirmed the impression that the consumer would be receiving a credit card. Tr. V at 29-31.

Assail's programs spawned thousands of customer complaints about the cards received.[4] For cards sold in connection with BABC, there were as many as one hundred thousand customer complaints during a seven-month period. For cards sold by Assail through its own programs, customer service was outsourced to Specialty Outsourcing Solutions ("SOS") in Waco, Texas. Assail provided "rebuttal" scripts for SOS representatives to use in addressing customer complaints. One of the methods that SOS used in assuaging customers was to inform them that keeping the card would improve their credit.[5] At its height, SOS had approximately 150 customer service representatives fielding calls for Assail's programs; between eighty and ninety percent of those calls were complaints.

We begin with a prefatory note. Mr. Kimoto's contentions on this appeal focus on three aspects of the pro-

---

[3] No equivalent recording was made of the sales call.

[4] In some instances, consumers received no card at all.

[5] Despite these representations, none of the companies involved in developing or marketing the package reported customer activity to Equifax.

ceedings: the sufficiency of the evidence to support his convictions; the responsibilities of the Government with respect to the timely disclosure of exculpatory and impeaching evidence; and the fairness of the sentencing procedure. With respect to each, we shall state the facts pertinent to the issue and then discuss our assessment of the merits of Mr. Kimoto's submission on appeal.

## II

### SUFFICIENCY OF THE EVIDENCE

Mr. Kimoto maintains that there was insufficient evidence to convict him on any of the counts of the indictment. He contends that the Government failed to establish his intent to defraud and that, with respect to the conspiracy count, the Government failed to show an agreement between he and Porcelli. We first summarize the evidence presented by the parties to the district court and then examine Mr. Kimoto's arguments in light of this evidence.

### A.  Background

Mr. Kimoto's telemarketing activities resulted in a criminal indictment being returned against him on June 20, 2007, in the Southern District of Illinois. Count 1 of the indictment charged Mr. Kimoto with conspiracy to commit mail fraud, wire fraud and money laundering. Count two charged Mr. Kimoto with mail fraud based upon the mailing of a "benefits package" to a victim in the district. Counts three through eight alleged wire

fraud based upon the telemarketing calls to local victims. Finally, counts nine through fourteen charged Mr. Kimoto with wire fraud related to the debit transfer from the consumers's bank accounts to payment processors for the processing fee.

**1.**

Mr. Kimoto's trial commenced in late March 2008. The Government's theory of the case was that Mr. Kimoto defrauded hundreds of thousands of people by using deceptive scripts in the marketing of his financial products. *See supra* pp. 3-4. Government witnesses testified that both the language employed and the structure of the sales pitch were designed to make the consumers believe that they were purchasing a credit card. For example, Shawn Hatfield, who worked for Rockwell and helped develop the debit-card program marketed by Assail, testified that the intent of the sales script was to make consumers "perceive" that "they were being pitched a Master Card credit card with a credit limit." Tr. II at 181-82. Hatfield testified that he later worked with Mr. Kimoto on other programs developed by Assail and that Assail used "very similar" scripts for all of its programs; these were designed to "mislead[] the customer[s]" into believing they would "receive a credit card." *Id.* at 183. He also confirmed that, with respect to these programs, Mr. Kimoto was responsible for the "[f]ront end," meaning "sales, marketing, training." *Id.* at 184. Similarly, Porcelli testified that the sales script for the product marketed in conjunction

with BABC was designed to "leav[e] the unmistakable impression in the customer's mind [that] they are going to get a credit card." Tr. III at 25. He further testified: "That was the way [Mr. Kimoto] told me it had to be sold and I went along with it." *Id.*

The Government proffered additional evidence that Assail, and specifically, Mr. Kimoto, knew that the scripts were deceptive because they developed "rebuttal" scripts for SOS to use in fielding customer complaints. *See* Gov't Ex. 40 & *supra* p. 4. The four scripted rebuttals were designed to re-sell the product to the unsatisfied customer. Customers were told that "having good credit is very important today and we want you to be able to benefit from this package." Gov't Ex. 40. Customers were reminded that they were getting "an unsecured master card, which we report to Equifax, that helps rebuild your credit in a short period of time." *Id.* Customers, who were still unconvinced of the worth of the product, were asked "what is it about improving your credit . . . that doesn't interest you?" *Id.* The "Final Effort" included informing the customer that

> [t]he reason why we called you in the first place is because your credit isn't as good as it could be. With Advantage Capitals [sic] not only are you going to have a master card in case of emergencies, but also you are going to be able to rebuild your credit in a short period of time.

*Id.* Jay Lankford, principal of SOS, testified that Assail would do "test calls" "to make sure you [we]re using all of the rebuttals and make sure you were not giving up too easy on the sale, to try to save the sale." Tr. IV at 57.

Lankford further stated that Assail would "demand[]" that, if a customer service agent failed to use all of the rebuttals, that agent be taken off the program. *Id.*

Finally, the Government produced evidence that Mr. Kimoto knew that the representations made in the rebuttal scripts also were false. Roger Howard, co-owner of Apex Merchant Services ("Apex"), which initially supplied debit cards to Assail, testified that he told Mr. Kimoto that the card supplied by Apex was "definitively not a credit card, that there was no credit worthiness" and that "there weren't any credit agencies that would report on it." Tr. VI at 141-42.

Mr. Kimoto defended his actions on the ground that he was engaged in the legitimate business of selling debit cards, that the scripts themselves were not deceptive, and that he did his best to ensure that employees who crossed the line—who affirmatively represented that the consumer was getting a credit card—were removed. He posited that, as a marketer, he was entitled to rely on the representations of those creating the product, but that he had been duped by unscrupulous criminals, here Porcelli and Howard, into believing that the products he was selling had credit worthiness. Specifically, he proffered the testimony of Jeff Ullman, who had introduced Mr. Kimoto to Howard; Ullman testified that Howard had represented that Apex could supply a debit card and that the use of the card could be reported to credit agencies. *See* Tr. VII at 168-71.[6]

---

[6] Mr. Ullman acknowledged, however, that the parties's
(continued...)

Mr. Kimoto's trial lasted for ten days, after which the jury convicted him on all counts of the indictment.

**2.**

In a post-trial motion for acquittal and a new trial, Mr. Kimoto contended that the evidence was insufficient to sustain his conviction. Specifically, Mr. Kimoto claimed that the Government had failed to establish that a conspiracy existed. The basis for his claim was (1) that several scripts entered into evidence specifically stated that the pay-as-you-go card was not a line of credit and (2) that there was testimony that he had "zero tolerance" for misrepresentations. R.58 at 3. Mr. Kimoto also argued that "[t]here was no testimony from any witness which would show [he] knew that the scripts might be misleading, or that customers felt misled." *Id.* at 4. Finally, Mr. Kimoto contended that the Government did not satisfy its burden of proving his participation in any of the overt acts alleged in the indictment. He claimed that this failure of proof was evidenced in the jury's "contradictory verdict" with respect to paragraphs A and B[7] of Count 1 of the indictment. *Id.* at 4.

---

[6] (...continued)
eventual written agreement did not incorporate a requirement that Apex report to Equifax. *See* Tr. VII at 180-81.

[7] Paragraph A stated: "Kimoto developed a sales model for the sale of a MasterCard Stored Value Debit Card as a credit card and targeted consumers with bad or no credit, who had
(continued...)

In its ruling denying the motion, the district court rejected these contentions. The court noted that Clifford Dunn, Assail's vice president and manager of its St. George, Utah office; Tully Herd, an Assail account manager; and Porcelli all testified that Mr. Kimoto intended to market the debit card as a credit card and that he knew the scripts were misleading. Turning to the issue of Mr. Kimoto's participation in the overt acts, the court noted that the jury found that Mr. Kimoto had committed the overt acts alleged in paragraph B, but not in A. The court determined that "any combination of 'yes' or 'no' answers to these two questions could be consistent because each alleges separate and distinct facts." R.72 at 10. The court also observed that "[t]he jury specifically found that the Government had proven beyond a reasonable doubt that Kimoto had committed four overt acts in furtherance of the conspiracy, which is more than sufficient to support their verdict." *Id.*

## B. Analysis

In seeking to overturn a jury verdict based on the sufficiency of the evidence, Mr. Kimoto faces a "daunting" task.

---

[7] (...continued)
applied for and had been turned down for a credit card." Paragraph B stated: "Kimoto put together an international network of 'affiliates,' call centers which made unsolicited telephone calls to consumers, including consumers in the Southern District of Illinois, utilizing the marketing plan and sales scripts developed by Kimoto." R.53 at 2.

*United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008) (internal quotation marks and citations omitted). "In reviewing a challenge to the sufficiency of the evidence, we do not weigh the evidence, *United States v. Bowman*, 353 F.3d 546, 552 (7th Cir. 2003), make credibility determinations, *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999), or resolve testimonial inconsistencies, *see United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003)." *United States v. Webber*, 536 F.3d 584, 597 (7th Cir. 2008). Instead, taking the evidence in the light most favorable to the Government, we " 'will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt.' " *Id.* (quoting *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006)).

### 1. Intent to Defraud

Turning to the first of Mr. Kimoto's arguments, he claims that, with respect to every count of the indictment, the Government was required to prove his intent to defraud. He further maintains that the Government attempted to prove this element by showing either that he intentionally marketed the pay-as-you-go card as a credit card or that he intentionally misled consumers into believing that the pay-as-you-go card would result in credit reporting. According to Mr. Kimoto, the jury explicitly rejected the first theory by answering "No" to Paragraph A of the verdict form for Count 1, and there simply was no evidence presented to support the second theory. We disagree.

Paragraph A of the jury verdict form for Count I of the indictment stated: "Kimoto developed a sales model for the sale of a MasterCard Stored Value Debit Card as a credit card and targeted consumers with bad or no credit, who had applied for and had been turned down for a credit card"; the jury responded "No" to this statement. R.53 at 2. However, the jury's rejection of one or more of the factual allegations contained in Paragraph A is not inconsistent with its finding that Mr. Kimoto possessed the requisite state of mind for fraud. The jury could have believed that Mr. Kimoto drafted the deceptive scripts used to make sales, but the jury may not have been convinced that *he alone* had "developed a sales model." Alternatively, the jury may have questioned whether *all* of the targeted consumers "had applied for and had been turned down for a credit card."[8]

---

[8]  Indeed, the reason that the jury answered "No" to Paragraph A may be that the language in Paragraph A differed from that used by some of the Government's witnesses. As suggested previously, the jury could have read Paragraph A as stating that Mr. Kimoto *alone* was responsible for developing the sales model. The jury also could have read the interrogatory as requiring that *all* of the targeted consumers recently had submitted a credit application and been turned down. However, Porcelli testified that Mr. Kimoto was the "*primary* author" of the sales model, not its *sole* author. Tr. III at 67 (emphasis added). Similarly, Porcelli testified that the target consumers were "people with no credit, bad credit or otherwise negative ability to process a transaction on a credit card";

(continued...)

Furthermore, there was testimony from which the jury could have concluded that Mr. Kimoto intentionally had misled consumers into believing that the pay-as-you-go card would result in credit reporting. As discussed previously, Howard, co-owner of Apex, testified that he told Mr. Kimoto that the card supplied by Apex was not a credit card, did not have credit worthiness and could not be reported on. *See* Tr. VI at 141-42. Additionally, Porcelli testified that, when Assail switched suppliers (from Apex to Stonebridge), both Mr. Kimoto and Porcelli were aware that use of the debit card could not be reported to credit agencies. *See* Tr. III at 37 (Porcelli testifying that Stonebridge told him "flat out that they did no reporting" and that Porcelli told this to Mr. Kimoto). Nevertheless, the sales scripts still implied that the card's use would be reported. *Id.* at 41 (Porcelli testifying that, after switching to Stonebridge, the sales scripts still read "and nothing looks better on your Equifax credit report than a Master Card").

---

[8] (...continued)

he did not testify that *every* targeted consumer recently had applied for, and been denied, a credit card. *Id.* at 58. Porcelli further explained the target audience accordingly:

> You want to use the example of a Chia Pet or Ginsu Knife, people who call in and want to buy the product over the air. The positive credit people are the responders who purchased and have a valid credit card. The negative credit people are the ones who send in a money order or who don't have a credit card and ended up not buying, but they did respond and try to place an order.

*Id.*

Essentially, Mr. Kimoto is arguing that the testimony of Porcelli and Howard should not have been believed. However, it was the province of the jury "to parse the facts, to weigh the credibility of each witness and to disregard the testimony of witnesses it found to be less credible or not worthy of credence." *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998) (internal quotation marks and citations omitted). We will not second-guess its credibility determinations.

### 2. Agreement

Mr. Kimoto also maintains that the evidence was insufficient for the jury to convict him on Count 1, the conspiracy count, because the evidence does not establish that he and Porcelli entered into a "common agreement" to defraud. *See* Appellant's Br. 25 (quoting *United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008)). Mr. Kimoto explains that "[e]ven if the jury believed that [he] knew or should have known the credit reporting representations were false, no evidence was presented that his purported co-conspirator, Porcelli, shared this knowledge and joined an agreement to make such a misrepresentation." *Id.* Mr. Kimoto's argument must fail for two reasons. First, it assumes that the only fraudulent statement in the sales script was the reference to Equifax reporting. However, several aspects of the sales and verification scripts were designed to mislead the consumer into believing that they were securing a credit, as opposed to a debit, card. *See* Gov't Ex. 2a

(script referencing a customer's application for a credit card and informing the customer of his eligibility to receive "your Visa or MasterCard"). Second, it ignores evidence in the record that both Mr. Kimoto and Porcelli knew that cards supplied by Stonebridge could not be reported on, but they nevertheless continued to employ the script that referenced the card's use being reported to Equifax.

There is ample evidence in the record to support the jury's conclusion that Mr. Kimoto had the requisite intent to defraud and that he and Porcelli, in fact, formed an agreement to commit fraud. Consequently, there is no basis on which to overturn the jury's verdict.

## III

### DISCOVERY ISSUES

#### A. Overview

The argument Mr. Kimoto pursues most vigorously is that the Government either intentionally withheld or destroyed evidence that was crucial to his ability to present a complete defense. We begin our consideration by setting forth the applicable legal standards that govern this area. We then shall recount the procedural context in which the district court addressed these standards. With this background, we shall turn to each of the specific contentions raised by Mr. Kimoto and assess the district court's disposition of each.

**B. Standards**

**1. *Brady v. Maryland***

In *Brady v. Maryland*, 373 U.S. 83, 88 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Over the years, the Court has expanded this duty in several ways. In *United States v. Agurs*, 427 U.S. 97, 107 (1976), the Court held that the duty is applicable regardless of whether there has been a request by the accused. Later, in *United States v. Bagley*, 473 U.S. 667, 676 (1985), the Court made clear that the duty applies to impeachment evidence as well as exculpatory evidence. Finally, *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), established that the duty applies to evidence known to police investigators even if unknown to the prosecutor.

The duty of disclosure under *Brady*, however, is not unlimited. We have explained that "a *Brady* violation only occurs if 'material' evidence is withheld, that is 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the pro-ceeding would have been different.'" *United States v. Stott*, 245 F.3d 890, 901 (7th Cir. 2001) (quoting *Bagley*, 473 U.S. at 682). "Furthermore, '[a]s long as ultimate disclosure is made before it is too late for the defendants to make use of any benefits of evidence, Due Process is satisfied.'" *Id.* (quoting *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir. 1979)).

Thus, "[t]o establish a *Brady* violation, the defendant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial." *United States v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008). We review a district court's *Brady* determination for an abuse of discretion. *United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005).

**2. *Arizona v. Youngblood***

There is a difference "between those situations in which the police fail to disclose to the defendant evidence that it knows to be material and exculpatory, and those situations in which police simply fail to preserve potentially exculpatory evidence." *United States v. Chaparro-Alcantara*, 226 F.3d 616, 623 (7th Cir. 2000). In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Court addressed the latter situation. In that case, the Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58.

> In such situations, failure to preserve evidence is not a violation of due process rights unless the defendant can demonstrate: (1) bad faith on the part of the government; (2) that the exculpatory value of the evidence was apparent before it was destroyed; and (3) that the evidence was of such a nature that

the petitioner would be unable to obtain comparable evidence by other reasonably available means.

*Hubanks v. Frank*, 392 F.3d 926, 931 (7th Cir. 2004) (citing *Youngblood*, 488 U.S. at 58; *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *United States v. Watts*, 29 F.3d 287, 289-90 (7th Cir. 1994)).

### 3.  Jencks Act

Finally, we turn to disclosure requirements under the Jencks Act, 18 U.S.C. § 3500. As we have explained:

> The Jencks Act was enacted in response to the Supreme Court's holding in *Jencks v. United States*, 353 U.S. 657 (1957). To ensure the meaningful confrontation of government witnesses, the Act requires the government, upon the defendant's motion, to produce statements made by any of its witnesses which the particular witnesses signed, adopted, or approved, and which pertain to their testimony at trial. 18 U.S.C. § 3500(b); *see also* Fed. R. Crim. P. 26.2; *United States v. Lopez*, 6 F.3d 1281, 1288 (7th Cir. 1993). The hope is that these statements will afford the defense a basis for effective cross-examination of government witnesses and the possible impeachment of their testimony without overly burdening the government with a duty to disclose all of its investigative material. *See United States v. O'Malley*, 796 F.2d 891, 900 (7th Cir. 1986); *United States v. Snow*, 537 F.2d 1166, 1168 (4th Cir. 1976).

*United States v. Johnson*, 200 F.3d 529, 534 (7th Cir. 2000).

Turning to the statutory provision, 18 U.S.C. § 3500(a)
states:

> In any criminal prosecution brought by the United
> States, no statement or report in the possession of the
> United States which was made by a Government
> witness or prospective Government witness (other
> than the defendant) shall be the subject of subpoena,
> discovery, or inspection until said witness has
> testified on direct examination in the trial of the case.

Once a witness has testified on direct examination, how-
ever, "the court shall, on motion of the defendant, order
the United States to produce any statement . . . of the
witness in possession of the United States which relates
to the subject matter as to which the witness has testified."
18 U.S.C. § 3500(b). Subsection (e) defines statement:

> The term "statement", as used in subsections (b), (c),
> and (d) of this section in relation to any witness called
> by the United States, means--
>
> > (1) a written statement made by said witness and
> > signed or otherwise adopted or approved by him;
> >
> > (2) a stenographic, mechanical, electrical, or other
> > recording, or a transcription thereof, which is a
> > substantially verbatim recital of an oral state-
> > ment made by said witness and recorded contem-
> > poraneously with the making of such oral state-
> > ment; or
> >
> > (3) a statement, however taken or recorded, or a
> > transcription thereof, if any, made by said
> > witness to a grand jury.

18 U.S.C. § 3500(e). If the Government fails to comply with an order of the court to deliver a witness's statement, "the court shall strike from the record the testimony of the witness." *Id.* § 3500(d). Although not set forth in the text of the Act itself, courts have held that relief may not be granted under the Jencks Act without a showing of prejudice. *See United States v. Johnson*, 200 F.3d 529, 535 (7th Cir. 2000) (collecting cases).

### C. Procedural Context

#### 1. Earlier FTC Proceedings

On January 9, 2003, the Federal Trade Commission ("FTC") filed a civil complaint against Mr. Kimoto and Assail ("FTC action"). The complaint alleged that a variety of individuals and corporations led by Mr. Kimoto engaged in a fraudulent telemarketing scheme in violation of 15 U.S.C. § 45(a). *See FTC v. Assail, Inc.*, 410 F.3d 256, 259 (5th Cir. 2005). Within a week of the filing, Mr. Kimoto had contacted Robert Draskovich "to represent him individually regarding potential criminal exposure, as well as to work along side Edward Moore regarding his representation for the pending case [FTC action]." R.14, Attach. 1 at 2.

On September 22, 2003, Mr. Kimoto, Assail and the FTC entered into a stipulated judgment. According to the terms of the stipulated judgment, Mr. Kimoto and Assail were jointly and severally liable for $106 million; however, the judgment was suspended to the extent that the amount exceeded Mr. Kimoto's assets, which

were to be liquidated by an appointed receiver. *See Assail*, 410 F.3d at 260. The stipulated judgment also provided for the court's retention of jurisdiction to modify or enforce the order.

One year after entering the stipulated judgment, the United States District Court for the Western District of Texas did modify the order. The FTC's continued investigation revealed that Mr. Kimoto had attempted to hide several million dollars in assets from the receiver. On motion of the FTC, therefore, the district court lifted the suspension on the stipulated judgment. R.59, Attach. (Final Monetary Judgment as to Defendants Kyle Kimoto and Assail, Inc.).[9]

### 2. Reverse Proffer

As set forth previously, on June 20, 2007, a grand jury returned a fourteen-count indictment against Mr. Kimoto. The day before Mr. Kimoto's arraignment and initial appearance, his counsel met with Government attorneys to view an eight-hour PowerPoint presentation.[10] During the PowerPoint presentation, the Government outlined its theory of the case that, in the sales and mar-

---

[9] We reference these proceedings because they bear on whether Mr. Kimoto had access to certain documents generated in connection with that action. *See infra* pp. 58-59. They play no other role in our consideration of the issues before this court.

[10] The Government refers to this presentation as its "reverse proffer."

keting of a debit card, Assail had used a telemarketing script, developed and approved by Mr. Kimoto, designed to mislead prospective buyers into believing that they actually were purchasing a credit card. The presentation included excerpts of video interviews with Mr. Kimoto's employees, a video interview of Porcelli and video interviews of Porcelli's employees. As part of its presentation, the Government also played a number of "verification" recordings, which contained misleading or deceptive statements.

### 3. Motions to Continue

Approximately six weeks later, on August 20, 2007, Mr. Kimoto's counsel filed his first motion to continue the trial date.[11] *See* R.8. Mr. Kimoto's counsel stated that he knew "of at least 3,000,000 pages of written discovery and hundreds of thousands of digital recordings that need to be examined in preparation for trial." *Id.* at 3. Mr. Kimoto did not request a continuance of a specific period, but asked for the ability to supplement his motion in forty-five days based on his initial review of the documentation. *Id.* at 4.

The Government did not oppose the motion, but requested a trial date set in February 2008, as opposed to the open-ended request of Mr. Kimoto. The Government noted that Mr. Kimoto's counsel had been involved in

---

[11] During the initial appearance and arraignment, the trial date was set for August 27, 2007.

his defense since 2003, when the FTC brought a civil action against Mr. Kimoto. The Government also informed the court that it had made a reverse proffer by way of the PowerPoint presentation and that it had "agreed to provide the dozens of hours of video interviews and the recorded telemarketing calls that it has in its possession, samples of which were played during the PowerPoint presentation." R.9 at 2. It noted, however, that it was "awaiting defendant providing the government with an external hard drive upon which to transfer the electronic evidence." *Id.* at 2-3. Finally, it advised that "there were searches conducted at three locations and the original documents seized are in an office in Fairview Heights maintained by the Postal Inspection Service. These documents are available to the defendant." *Id.* at 3. Although acknowledging the voluminous documentation at the defendant's disposal, the Government also informed the court that "the business records are largely peripheral to the key issues in the case which depend for the most part on the scripts, training manuals, contracts and email." *Id.* at 4.[12] The

---

[12] After filing its original memorandum concerning the trial date, the Government filed a Supplemental Memorandum that included as an attachment an application for attorneys' fees that Mr. Kimoto's counsel had filed in the FTC action. The application for fees recounted that counsel had spent approximately 592 hours in the representation of Mr. Kimoto in the FTC investigation, that he had been engaged by Mr. Kimoto "to represent him individually regarding potential criminal
(continued...)

district court granted the continuance and set a trial date of February 4, 2008.

In a teleconference held later in August, Mr. Kimoto's counsel, Mr. Draskovich, informed the court that, due to several other trials scheduled in early 2008, he would not be able to prepare adequately for Mr. Kimoto's trial if it were to commence on February 4, 2008. The court, therefore, asked Mr. Kimoto's counsel to file another motion to continue. Mr. Kimoto's counsel did file a second motion,[13] which was granted by the court. Mr. Kimoto's trial then was rescheduled for March 31, 2008.

On October 22, 2007, the Government provided a hard drive[14] to Mr. Kimoto's counsel containing all of the digital and video information that had been reviewed by

---

[12] (...continued)

exposure, as well as to work along side Edward Moore re-garding his representation for the pending case," and that it was clear at that time that Mr. "Kimoto could face criminal prosecution." R.14, Attach. 1 at 2. The affidavit in support of the application for fees averred that counsel had spent hours "[a]nalyzing voluminous materials and documents," *id.*, Ex. 1 to Attach. 1 ¶ 3, and reflected over forty time entries dedicated to reviewing documents or other discovery.

[13] In the second motion, in addition to recounting the trials to which he already was committed, Mr. Kimoto's counsel also reiterated the voluminous discovery that needed to be reviewed in preparation for trial. *See* R.16 at 2.

[14] The defense sent a hard drive to the Government on September 24, 2007. *See* R.42, Ex. E.

the Government in preparation for the reverse proffer. Specifically, Postal Inspector Adam Latham wrote to Mr. Draskovich: "Enclosed you will find the hard drive with our electronic discovery for the above referenced case. On the disk you will find five data directories . . . ." R.40, Attach. C. The data directories listed were "Assail," "FBI," "FTC," "Assail and BABC Videos" and "VoiceLog." *Id.* The origin of all of the information was provided. Additionally, it was clear that the discovery did not represent all of the information within the Government's possession, but *only that which the Government had reviewed*. Specifically, with respect to the VoiceLog directory, Inspector Latham stated:

> [T]his directory contains digital audio recordings of BABC, FALC, and Assail program sales verifications that were recorded by VoiceLog. The 750+ files in this directory are the digital recordings that we downloaded from VoiceLog's server—*there are several hundred thousand other verifications that we did not review*.

*Id.* (emphasis added). Following this disclosure, the defense did not request the digital discovery in any other format, nor did it request additional digital discovery. As well, the defense did not seek access to the repository of documentary and digital evidence at the Fairview Heights facility at that time.

Three months later, on January 29, 2008, Mr. Kimoto filed his third motion to continue. Again the reason cited for the requested continuance was the "voluminous

paper discovery in this case,"[15] as well as the "extensive digital discovery" received from the Government. R.18 at 2.[16] The Government objected to the continuance primarily on the ground that, although there was voluminous paper and digital discovery, little of that material was pertinent to the issues in the case—whether the scripts used to market the pay-as-you-go card were fraudulent. Additionally, the Government noted that Mr. Draskovich had represented Mr. Kimoto in the FTC action, and, therefore, presumably was familiar with much of the documentation at issue.[17]

The district court denied the third continuance. It acknowledged that there was a great deal of evidence available to the defense, but noted that Mr. Draskovich had been involved in the case for some time, that the Government's theory of the case was straightforward, and that there was no suggestion that "the Government ha[d] shortened [Mr. Kimoto's] effective preparation

---

[15] At this point, the defense team still had not reviewed the evidence located at the Fairview Heights facility.

[16] Mr. Draskovich acknowledged at that time that the VoiceLog verifications received were "just a minute sample of over 300,000 recordings made." R.18 at 2.

[17] The Government also argued that, "[w]hile there is substantial documentary evidence and voluminous verification calls, what is missing from defendant's motion is how a review of all of the records seized from the search and a review of all the verification recordings is either necessary or helpful to the development of a defense given the government's indictment and theory of the case." R.19 at 6.

time or failed to provide him with necessary discovery materials." R.21 at 4.

### 4. Discovery

On February 27, 2008, members of the defense team visited the Fairview Heights location to review the evidence in the Government's possession. Members of the defense team spent four days reviewing documentation in both paper and digital form; they had access to all of the Government's evidence, consisting of thirty-three boxes of documents and thirteen hard drives. After the defense team departed, copying of documents continued with the cooperation, and under the supervision, of postal inspection workers.

On approximately March 7, 2008, the defense retained the services of Daniel Libby, a former naval cryptologist and expert in computer forensics;[18] the defense engaged Libby's services for the sole purpose of reviewing the digital evidence provided. On March 11, 2008, Libby requested that the defense team procure forensic images of the data turned over by the Government. According to Libby, "[a] forensically sound image" is a byte image of the hard drive, not simply a copy of the file system, and "insures that the evidence is not altered and or tainted during the review" of the digital evidence. Tr. of Hearing on Motion to Dismiss at 10. Libby was able to determine right away that the hard drive

---

[18] Prior to this time, in November 2007, Mr. Kimoto had retained a service to review digital evidence.

provided by the Government was not a forensically sound image. *Id.* at 72.

Sometime between March 12 and March 17, 2008, defense counsel wrote to the attorney for the Government concerning the forensic images requested by Libby;[19] counsel for Mr. Kimoto stated: "[W]e have received a substantial amount of discovery, including, but not limited to, a hard drive containing extensive documentation. However, we are of the belief this is not a forensic copy, and does not contain every piece of digital evidence recovered." R.42, Ex. K at 1. Counsel requested a "[f]orensically sound copy . . . of ALL data derived from Information Systems seized and/or forensically acquired in this matter." *Id.*

---

[19] The record is not clear as to when, if at all, this request was received in writing. One of Mr. Kimoto's counsel states in an affidavit that he called Assistant United States Attorney ("AUSA") Dan Reppert concerning the request, and, when he did not receive a response, he sent the request by fax (dated March 13, 2008). *See* R.30, Ex. 1. AUSA Reppert represents in the response to the motion to dismiss that he received a voice mail from defense counsel on March 17, 2008, when he was in trial. At that time, he misunderstood the nature of the request; he believed that defense counsel needed a code to unlock some of the files, and he instructed his assistant to provide it to defense counsel. According to AUSA Reppert, he never received a hard copy of the request, and the true nature of the request was not made known to him until March 21, 2008—the day his trial was completed—when he spoke with Mr. Draskovich by telephone.

On March 21, Mr. Draskovich and AUSA Reppert spoke over the telephone. During this conversation, Mr. Draskovich informed AUSA Reppert that he had been operating under the belief that the hard drive provided to him in October 2007 was a complete, forensically sound copy of *all* of the digital information in the Government's possession, rather than just the materials that the Government had reviewed in preparation for the reverse proffer. Although AUSA Reppert did not believe that there was any genuine question concerning what had been provided, based either on the digital information contained on the hard drive or on the cover letter accompanying the hard drive, he reluctantly agreed not to oppose a motion to continue should one be filed. Instead of seeking a continuance to review the additional materials, however, Mr. Kimoto filed a motion to dismiss on March 24, 2008.

Nevertheless, in response to the request made by the defense, the Government sent all of its original digital evidence, not copies, by Express Mail directly to Libby for his review. Libby stated that "this [wa]s the first time in [his] career that the Government ha[d] ever provided original evidence." Tr. VI at 25.

### 5. Motion to Dismiss

In his motion to dismiss, Mr. Kimoto first recounted the defense team's review of the digital evidence provided by the Government. He stated:

> Because of the voluminous nature of the digital discovery, Counsel retained . . . ProSearch Strategies, Inc., a

company specializing in collecting, preserving, pro-
cessing, culling, reviewing and producing digital
information. . . .

Upon beginning their work, ProSearch advised
Counsel that the discovery provided to the defense
did not appear to be a complete forensic copy, and
that such was necessary to verify the data as accurate
and unaltered.

R.30 at 2-3.[20]

Mr. Kimoto's motion then went on to explain the
efforts of his team to locate two e-mails, which had been
discussed at length in the reverse proffer provided by
the Government. Mr. Kimoto described the discussion of
the e-mails in the reverse proffer as follows:

Mr. Aronson and Assistant United States Attorney
Bruce Reppert spent almost seven minutes
specifically addressing two emails sent from Peter
Porcelli to Alan Aronson on or about July 23, 2002 and
August 6, 2002. According to the Government (in the
video), these emails laid out Mr. Porcelli's scheme
for changing company names to avoid prosecution.
These emails indicated that new companies would
be formed every four to six moths [sic] in different
cities with different CEO's [sic], would market the

---

[20] Mr. Kimoto's motion, however, did not provide the date
that his counsel was informed by ProSearch that the digital
discovery provided "did not appear to be a complete
forensic copy." R.30 at 3.

exact same thing as the previous companies, would all be controlled by Mr. Porcelli, and would sit dormant once the complaints got too high. According to the testimony, these emails were between Mr. Porcelli and Mr. Aronson only.

R.30 at 4.

According to Mr. Kimoto, despite an exhaustive search, his team could not locate the e-mails anywhere in the digital materials provided by the Government. In all, Mr. Kimoto claimed that his computer experts could find only approximately one hundred Porcelli e-mails, compared to the thousands that Mr. Kimoto believed must have existed. According to Mr. Kimoto, "**[t]he missing emails . . . are clearly exculpatory because they show the presence of a conspiracy between Mr. Porcelli and Mr. Aronson outside the presence or knowledge of Mr. Kimoto, and they have strong impeachment value against Mr. Porcelli, a key government witness**." *Id.* at 12 (emphasis in original). Additionally, Mr. Kimoto argued that the failure to provide him with a complete forensic copy of all digital files impaired his ability to prepare a defense. *See id.* at 15.[21] Finally, Mr. Kimoto submitted

---

[21] Specifically, Mr. Kimoto argued:

It is important to note that this case revolves around the realm of digital forensics and e-discovery, and that such are difficult concepts for many to understand. E-discovery and digital forensics are important because they are the only way to verify that a complete record of the alleged

(continued...)

that he should not be punished "because the Government failed to properly preserve or maintain a digital forensic copy of the data. It was the Government who raided both BABC and Assail, and waited five years to prosecute the case." R.30 at 16.[22]

In its response, the Government pointed out that it never had received a request for a forensically sound image until March 17, 2008. When it did so, the Government agreed to ship all of the original computer images to Libby's laboratory; this was done on March 28, 2008, via Express Mail. The Government also noted that, in papers filed with the court, Mr. Kimoto stated that he had retained an investigator, who had been reviewing digital discovery since November 1, 2007; according to

---

[21] (...continued)

> digital crime scene are kept. . . . Without [a forensic record], there is no way to verify what the source of the data is, when it was modified, who modified it, who regularly accessed it, how it was processed, where it was stored, and how it was networked throughout the workplace. Without this forensic copy, Mr. Kimoto forced [sic] to look at databases that are not linked properly, and are therefore, inaccessible. Therefore, he is unable to even reference the histories of the alleged victim's [sic] in this case.

R.30 at 15.

[22] Mr. Kimoto also concluded that, based on the significance of the evidence, "[t]here c[ould] be no other conclusion than that the government has acted in bad faith in failing to provide Mr. Kimoto with a digital forensic copy of the evidence." R.30 at 17.

the Government, "it should have been obvious that the electronic discovery provided did not consist of complete 'forensic' images" because the "imaged hard drive contain[ed] executable files as well as data and working files." R.40 at 11.[23]

Turning to Mr. Kimoto's allegation that the Government had destroyed[24] e-mails between Assail and Porcelli, the Government argued that the claim was founded on nothing more than speculation:

> In order to reach this conclusion, the defendant has to stack an innuendo upon an already large pile of baseless and gratuitous assumptions. First, the defendant assumes that Bay Area Business Council maintained an email server on premises at their offices in Tampa. There is no evidence of that. Second, defendant must assume that Bay Area Business Coun-

---

[23] Indeed, it was apparent to Libby, who was retained on March 7, 2008, that he needed the forensic files to verify the authenticity of the digital files.

[24] With respect to the allegation that the Government had "broken links with other computers," R.40 at 12, the Government explained that it had "encountered this problem while we were trying to access customer databases in Assail's electronic files in an effort to identify victims," *id*. It further stated that "[t]here were no network schematics in the Assail records seized during the search and hence there was insufficient information from which the database could be reconstructed given the broken links. To establish that there were broken links is a far cry from establishing that the government has 'destroyed' *anything*." *Id*.

cil maintained a policy of archiving their email, instead of purging it. There is no foundation for that. Third, defendant must assume that the email server was on hand and the data intact at the time the Federal Trade Commission successfully threw Bay Area into receivership. . . . Fourth, defendant must assume that Porcelli sent his email through Bay Area's email server in the first place. He appears to have used an internet email account established with Compuserve. Fifth, defendant assumes that what few emails the government has used in its case in chief were recovered from that email server, also an unwarranted assumption as the government found physical copies printed in Bay Area's files at the time of take over.

*Id.* at 13-14. Focusing again on the e-mails, the Government stated that it was "particularly disingenuous" that Mr. Kimoto was arguing that a due process violation arose as a result of the Government's not disclosing the e-mails. *Id.* at 16. It stated:

[T]he emails were featured prominently in the government's reverse proffer in the video testimony of Alan Aronson which was exhibited to defendant and his counsel and in fact provided *in toto* on the external hard drive in October. The fact that defense could not locate the hard copies in the files they inspected and chose not to specifically request them from the government does *not* establish either that they have been "destroyed" or not properly disclosed . . . . It can hardly be said that the govern-

ment has failed to "properly disclose" evidence which is featured in a PowerPoint shown to the defendant.

*Id.* at 16-17.[25] The Government further argued that Mr. Kimoto "misunderstood" the prosecution's *Brady* obligations; it explained that "[t]he government's obligation is to make evidence *available*, which it has done . . . ." *Id.* at 17.

---

[25] Although not raised in the motion to dismiss, the Government also addressed Mr. Kimoto's complaint, raised during the course of trial, that only two-thirds of one percent of the consumer complaints made to SOS were available in paper form. Because there was testimony that approximately one million complaints were lodged, the defense argued, the Government must have destroyed the remaining several hundred thousand complaints. The Government responded that this was a "massive *non sequitur*." R.40 at 15. It continued:

> Jay Lankford testified that all these complaints should be on the "server." Moreover, given the fact that SOS's network and Assail's server in Kansas City were exchanging data on a daily basis, given the fact that Assail's offices in Kansas City were never raided, certainly Kimoto should currently have this data unless, together with Dunn's computer and Assails' [sic] email in St. George (according to Dunn's testimony), the data was destroyed at the direction of Kimoto himself. An examination of the stack of complaints that defendant introduced suggests that these are simply selected printouts of what was originally entered electronically in Assail's system. If they were original documents, presumably they would have been handwritten. . . . For some reason, someone decided to print out the complaints we have.

*Id.*

After trial commenced, the district court held a hearing on the motion to dismiss. During the hearing, Mr. Kimoto presented extensive testimony by Libby and other witnesses, as well as argument by counsel. The court denied the motion by oral ruling on April 16, 2008, which was followed by a written order issued on May 8, 2008. In its order, the district court considered whether the failure to turn over digital versions of Porcelli's e-mails or the failure to supply Mr. Kimoto with a forensic copy of all of the digital files violated either the duty established in *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence or the duty established under *Arizona v. Youngblood*, 488 U.S. 51 (1988), to preserve evidence. The district court rejected both claims:

> Kimoto's assertions regarding the "missing e-mails" do not rise above the level of speculation. What emerges from the parties' submissions and from testimony is not a depiction of any animus toward Kimoto or any design or purpose to deprive him of exculpatory evidence but a singularly cooperative effort by the Government to apprise Kimoto of the case against him and to provide him with all relevant discovery.

> . . .

> Mr. Libby testified that there was nothing unusual in the way that the files, identified as "native" or "second generation," were first provided by the Government. Libby explained that a forensic image collects each bit and is a complete representation of original media. A secondary collection, such as he

received, is the result of forensic acquisition and processing of that data. Libby testified that it was readily apparent that the files were not forensic images—and did not purport to be—but second generation files in which data was extracted by the original examiner and produced to agents in conjunction with their investigation. The Court notes that Kimoto's investigator, Robert Lawson, acknowledged that he had received the hard drive from Kimoto's counsel on November 1, 2007, and had been reviewing discovery an average of six hours a day. The files were also reviewed by Kimoto's counsel, Damian Sheets, who professed to be knowledgeable about computers. Given that it was "readily apparent" that the files were not forensic images, Kimoto should have been aware well before March 17, 2008, that second generation files had been provided.

. . .

Upon inquiry by the Court, Mr. Libby stated that the hard drives that were sent to him were not those taken from machines at the time the warrant was executed but the images that were copied onto the hard drives. Assistant United States Attorney Reppert represented that the original hard drives were probably returned and that the warrant language allows forensic images to be made. This representation is supported by the testimony of Latham who stated that the hard drives seized from Specialty Outsourcing Solutions ("SOS") were returned. Latham also testified that he received no forensic images from the Secret Service and that no computer evidence

was destroyed. The Government cannot turn over material that is not in its possession. And the hard drives returned could have been the subject of subpoena so that they may have been available from their original owners separate and distinct from the Government.

There is no evidence that the e-mails were printed and retained rather than being purged or deleted. There is evidence, however, that Porcelli used Compuserve for his e-mail in place of or in addition to using the BABC e-mail server. If that were the case, the e-mails would reside not on Porcelli's computer but on a central Compuserve computer—and again be subject to subpoena. Furthermore, even if the e-mails contained evidence of a conspiracy between Porcelli and Aronson, this does not preclude the possibility of a conspiracy between Porcelli and Kimoto. The Court questions the relevancy, and therefore the admissibility, of e-mails inculpating Porcelli and Aronson in a conspiracy claimed to be independent of the Kimoto-Porcelli conspiracy. Nor does the defense's showing of a conspiracy between Porcelli and Aronson, of which Kimoto had no knowledge, relieve Kimoto of his responsibility in the Kimoto-Porcelli conspiracy. One need not know all his co-conspirators in order to be guilty of conspiracy. Kimoto had written scripts and had a history as a telemarketer prior to his meeting with Porcelli.

R.66 at 7-9. Turning to the alleged loss or destruction of the hundreds of thousands of customer complaints taken from SOS, the court stated:

There is no foundation to conclude that Jay Lankford, a principal of SOS, had copies of several hundred thousand complaints on hand when the Secret Service searched the facility. The Secret Service recovered thirty-three boxes of documents from SOS, all of which were made available to the defense. Additionally, the information Kimoto sought may have been available from another source, since the SOS server exchanged data on a daily basis with Assail's server in Kansas City, the offices of which were not raided.[26]

Actions taken by Assail and Kimoto himself lend little credence to the argument that e-mails existed which were important and contained exculpatory evidence. The Assail information technology director, Charles Davidson, testified that he destroyed back-up

---

[26] Similarly, the court determined that there was no destruction of SOS computer links:

Kimoto's counsel represented that he can access nothing from the SOS data base because the links are broken. However, there is no basis to conclude that the Government knew that by disconnecting the computers it would be dismantling the network and destroying links that could not be recreated. Mr. Libby testified that agents executing a search warrant on site would not know in advance if computers were linked across the "internet backbone" and could not plan for that. Additionally, he testified that the agency is limited by the scope of the warrant, and a relational database could not be searched if it were not in the warrant.

R.66 at 8.

tapes and e-mail, and Clifford Dunn testified that e-mails were purged and that Kimoto ordered his computer destroyed.

As to motive, the Court finds no bad faith, that is, no "conscious effort to suppress exculpatory evidence," *Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992), on the part of the Government with respect to Kimoto's allegations. Even if the e-mails had been preserved and were lost or destroyed by the Government, the Court cannot infer bad faith because the exculpatory significance of the e-mails was not apparent, given the Government's theory of the case, as thoroughly outlined to Kimoto. . . . That the Government invested the e-mails with little importance is made clear by the fact that in its eight-hour PowerPoint "reverse proffer," among the video clips, verification recordings, images of sales scripts and references to the law applicable to the case, only three e-mails were featured. Kimoto chose, possibly for strategic reasons, not to alert the Government to the nature of the information he was seeking, which was certainly reasonable and proper. However, it shows no bad faith on the part of the Government that it failed to perceive how this information could be material and relevant to any defense theory, even if such information had been in the Government's possession.

R.66 at 9-10.

The Court noted that there were two additional reasons why it should not grant the motion to dismiss.

First, Mr. Kimoto had not sought a continuance "based upon Libby's eleventh hour revelations and the alleged discovery miscommunication regarding the computer files that were obtained by the Government . . . and provided to Kimoto." *Id.* at 10. Although the Government had agreed not to oppose a continuance, and the court previously had indicated that withholding of necessary discovery materials would be a reason for granting a continuance, "Kimoto elected to forgo the opportunity to have his expert obtain and review the information which he now contends is so crucial to his defense." *Id.* at 11. Additionally, the court observed that, although it was readily apparent that forensic files were not provided, Mr. Kimoto did not retain Libby until three weeks before trial and did not seek to obtain forensic images until two weeks before the trial. The district court believed that "Kimoto should have raised the problem of which he now complains much earlier than three business days prior to the start of trial." *Id.* at 11-12.

The court summarized its holding accordingly:

> The Government allowed open file discovery and sent to defense counsel a 500-gigabyte hard drive loaded with eight of eleven CDs and DVDs, which included, in the Government's estimation, all of the material that underlay its case. According to testimony by Postal Inspector Latham, thirty-three boxes of evidence, seized from SOS, were made available to Kimoto; hard drives seized from SOS were returned. In the absence of an articulated request, the Government had no further obligation.
>
> . . .

The Court has herein articulated its reasons for its April 16th Order denying Kimoto's Motion to Dismiss (Doc. 46). Kimoto failed to establish that the Government intentionally withheld electronic evidence for the purpose of depriving him of the use of that evidence during his trial. Specifically, Kimoto failed to show bad faith on the part of the Government, failed to show that the exculpatory value of the evidence was apparent and failed to show that he could not have obtained comparable evidence by other reasonably available means.

*Id.* at 12 (citing *United States v. Watts*, 29 F.3d 287, 289-90 (7th Cir. 1994)).

### 6. Post Trial Motions

In his post-trial motion for acquittal and a new trial, Mr. Kimoto renewed his argument that the Government's withholding and/or destruction of evidence impeded his ability to mount a defense. With respect to discovery, Mr. Kimoto also submitted that he was entitled to a new trial because the "Government's failure to provide any digital evidence and the Government's production of only 4,600 of 800,000 physical documents taken from [SOS] prevented Mr. Kimoto from adequately preparing his defense." R.58 at 6 (emphasis in original). Additionally, Mr. Kimoto claimed, a new trial was warranted because the Government failed to provide him with exhibits accompanying the video deposition of James Sierra. These exhibits consisted of e-mails sent by Roger Howard, a Government witness, and therefore

constituted material that should have been produced under the Jencks Act, 18 U.S.C. § 3500.

The court recounted, at the outset, that it had "exhaustively considered the issue of the Government's alleged failure to preserve and to provide physical and digital evidence in its May 8, 2008 Order denying Kimoto's motion to dismiss." R.72 at 13. Specifically, it reviewed the testimony of Jay Lankford, principal of SOS, in detail, as well as that of Postal Inspector Adam Latham. After this review, the court concluded that computers and hard drives had been seized from SOS and were returned. With respect to the documents, the court held that "Kimoto's chain of assertions simply does not link up. There is no evidence that SOS had nearly 800,000 handwritten customer inquiry forms on its premises when the federal agents executed their search warrant or that, if present, the documents were actually seized by agents or, if both present and seized, that the documents were destroyed." *Id.* at 14-15. Finally, the court also observed that, based on Lankford's testimony, "the documents at issue were available to Kimoto on a database linked to the SOS system in Assail's Kansas City offices, which were not raided." *Id.* at 15. Finally, the court also held that "Kimoto [had] provide[d] no objective reason to believe that the documents would have been helpful to him." *Id.* Indeed, this was doubtful based on the testimony presented that Mr. Kimoto had ordered the destruction of thousands of documents, both digital and in hard copy.

Turning to the alleged withholding of Jencks material, the district court determined that Mr. Kimoto's argu-

ment was more appropriately classified as a *Brady* claim. The court observed that, although Mr. Kimoto had entered into a stipulated judgment with the FTC at the time Sierra's deposition was taken, Mr. Draskovich remained Mr. Kimoto's counsel of record. Thus, the document allegedly withheld was available to Mr. Kimoto through the exercise of reasonable diligence.[27]

## D.  Mr. Kimoto's Specific Contentions

### 1.  Forensic Images

Mr. Kimoto first maintains that the Government's failure to provide him with complete forensic images of all digital evidence within its possession constituted a *Brady* violation. We cannot agree. Even if we could categorize the forensic images as exculpatory or impeaching, the district court did not abuse its discretion in determining that the Government did not withhold this evidence. Additionally, even if we could conclude that the Gov-

---

[27] Subsequently, Mr. Kimoto filed a motion to reconsider the court's denial of his motion for acquittal and for a new trial. In it, he claimed that the court should have considered his claim under the Jencks Act, not under *Brady*. The court determined, nonetheless, that Mr. Kimoto knew of the exhibits to the deposition long before trial and had made no effort to secure them. Additionally, the court noted that Mr. Kimoto had not established that the exhibits were in the hands of the prosecution team and had not established that he had suffered any prejudice. The court also determined that Mr. Kimoto's other arguments were without merit or were untimely.

ernment withheld this evidence, the district court's con-
clusion—that Mr. Kimoto was not prejudiced by the
Government's action—was not an abuse of discretion.

The record is clear that the Government made both its
documentary and digital evidence available to the
defense from the very beginning of this case. In
October 2007, five months prior to trial, the Government
provided the defense with *all* of the digital evidence *that
it had reviewed and used in preparation for the reverse prof-
fer*. Although Mr. Kimoto had several individuals working
on the files beginning in November 2007—all purportedly
conversant in digital technology—these individuals either
did not realize that they were not working with forensi-
cally sound images or did not communicate the importance
of obtaining a forensically sound image to defense counsel.
Alternatively, they informed defense counsel of their
needs, but no action was taken to secure a forensically
sound image of the digital evidence. Regardless, it was not
until Libby joined the defense team, three weeks before
trial, that he requested forensic files and that the request
was passed on to the Government. It is undisputed that the
Government did not receive a request for forensic files
until, at the earliest, March 11, 2008.

Furthermore, the Government, although skeptical that
there was any genuine confusion about the nature of the
digital material that had been provided to Mr. Kimoto in
October 2007, informed defense counsel that the Govern-
ment would not oppose a continuance to allow Libby
an opportunity to review the digital evidence. We have
held that "[a]s long as ultimate disclosure is made before

it is too late for the defendants to make use of any benefits of evidence, Due Process is satisfied." *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir. 1979). Mr. Kimoto, therefore, was not prejudiced by any action of the Government. By contrast, it was the defense's failure to timely request forensic files and its concomitant decision to forego a request for a continuance that prevented Mr. Kimoto from being able to secure and review the files in the format he sought. The district court, therefore, did not abuse its discretion in determining that the Government's actions with respect to forensic images did not constitute a *Brady* violation.

### 2. Material not Examined by the Government

Mr. Kimoto also maintains that he is not really complaining about forensic files, but about the Government's failure to turn over *all* digital evidence in a timely fashion. Specifically, Mr. Kimoto contends that the Government misled him into believing that the one hard drive provided to him in October 2007 included all digital evidence in the Government's possession. We cannot accept this contention. In the letter accompanying the hard drive provided in October 2007, Postal Inspector Latham stated: "Enclosed you will find the hard drive with *our electronic discovery* for the above referenced case. On the disk you will find five data directories . . . ." R.40, Attach. C (emphasis added). As well, Postal Inspector Latham specifically informed Mr. Kimoto's counsel that one of the directories contained:

> audio recordings of BABC, FALC, and Assail program sales verifications that were recorded by VoiceLog. The

> 750+ files in this directory are the digital recordings
> that we downloaded from VoiceLog's server—*there
> are several hundred thousand other verifications that we
> did not review*.

*Id.* (emphasis added). Thus, at least with respect to the VoiceLog recordings, it was readily apparent that there was significant digital evidence that was not included on the hard drive. At no time did anyone affiliated with the prosecution team represent that the hard drive produced in October 2007 contained all digital evidence in the Government's possession.

Furthermore, the record reflects that, if there were any genuine confusion concerning what was produced in October 2007, Mr. Kimoto's counsel either became aware of, or should have become aware of, this deficiency prior to March 13, 2008—the first time *any* discovery request was submitted to the Government. The record reflects that Mr. Kimoto had hired investigators to review digital evidence in November 2007. At oral argument, counsel represented that, as Mr. Kimoto's investigators delved further into the files, it became "clearer and clearer" to them that certain digital evidence, which was thought to exist, was not in the materials that had been supplied. Again, however, no additional evidence—nor any clarification of what the Government had produced—was requested until the middle of March 2008. When the alleged confusion was brought to the Government's attention, it agreed not to oppose a continuance.

Under these circumstances, the district court's determination that the Government's actions did not constitute a *Brady* violation certainly was not an abuse of discretion. Again, assuming the existence of some exculpatory evidence somewhere in the digital materials not reviewed by the Government, the defense was provided these materials prior to trial and with an offer not to oppose a motion to continue. In sum, the production was made "before it [wa]s too late for the defendants to make use of any benefits of evidence." *Stott*, 245 F.3d at 901 (internal quotation marks omitted).

Moreover, even assuming that exculpatory material was withheld, we have stated that, when a defendant realizes that exculpatory evidence has been withheld, the "appropriate course" is to seek a continuance if "more time to investigate the exculpatory potential of the evidence" is needed. *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001). Here, the defense realized before trial that it had misunderstood what the Government had copied onto the hard drive. The Government, based on this misunderstanding, agreed not to oppose a continuance.[28] Thus, any prejudice to the defendant was not the product of the Government's action, but of Mr. Kimoto's conscious decision to forego a motion to continue and to file instead a motion to dismiss.

---

[28] The district court observed that it could not "recall a time . . . when it did not grant a continuance where, as here, it would have been requested by the defense and the Government indicated it would not object." R.66 at 11.

In addition to his general claim that there must have been some, unidentified, exculpatory evidence among that withheld, Mr. Kimoto identifies two specific pieces of evidence, which were not disclosed to him prior to trial and which, he believes, impeded his ability to mount a defense. The first includes homosexual pornography stored on Clifford Dunn's computer. Mr. Kimoto alleges that "[t]his revelation that Dunn had something of his own to hide on his computer would have provided an alternative explanation for deletions of data that Dunn attributed to Kimoto." Appellant's Br. 38. This material, however, was not withheld from the defense, but was located at the Fairview Heights facility and, therefore, available to the defense at any time. Had Mr. Kimoto sought a continuance, it would have been available for the defense to use at trial. Thus, again, any prejudice to Mr. Kimoto resulted from his own failure to review the digital information in a timely fashion and to seek the court's assistance when he realized that there had been a misunderstanding with respect to the extent of the digital evidence in his possession.

Mr. Kimoto also references e-mails between Porcelli and Aronson that evidence a conspiracy between those two, without direct reference to Mr. Kimoto. Mr. Kimoto claims that not only was he deprived of the impeachment value provided by these two e-mails, but surmises that, to the extent that Porcelli's other e-mails "were consistent with the little we know about the emails that were produced, they could only have served to bolster Kimoto's case and undermine the Government's." *Id.* at 38-

39. After the hearing on the motion to dismiss, the district court found that there was no evidence to support Mr. Kimoto's conclusion that the Government had obtained the e-mails referenced in the reverse proffer from a BABC database. *See* R.66 at 8. The court specifically noted that there was evidence that Porcelli used Compuserve "for his e-mail in place of or in addition to using the BABC e-mail server." *Id.* Furthermore, given the reference to, and discussion of, the e-mails in the reverse proffer, it hardly can be argued that the Government withheld this evidence from Mr. Kimoto. Mr. Kimoto simply assumed that the e-mails used by the Government existed in digital form and, when they could not be located, *never requested* the e-mails from the Government in any other form.

We only add that we, like the district court, are at a loss to see how Mr. Kimoto was prejudiced by any action of the Government. At some point prior to the cross-examination of Porcelli, the defense team either was provided with hard copies of the e-mails or located the hard copies of the e-mails among the documents in its possession. Mr. Kimoto's counsel then cross-examined Porcelli extensively on the contents of these e-mails. *See* Tr. III at 161-75. Clearly, therefore, the disclosure was made in time for Mr. Kimoto to make use of the evidence at trial. *See Stott*, 245 F.3d at 901.

Given that Mr. Kimoto was able to use these "missing" e-mails in his cross-examination of Porcelli, the crux of Mr. Kimoto's argument appears to be that, had he been able to access the full complement of Porcelli's e-mail,

Mr. Kimoto would have discovered evidence of even greater impeachment value to use during trial. However, as noted by the Government, this involves a series of assumptions too weak to support a due process claim. *See supra* pp. 33-34 (quoting R.40 at 13).[29]

---

[29] Finally, Mr. Kimoto makes a separate argument, developed fully only in his reply, that there possibly was other digital and documentary evidence which had not been made available to the defense prior to trial. *See* Reply Br. 8. His belief is based on his post-trial review of the digital and documentary evidence that the Government provided to him prior to trial. This argument was not raised before the district court until Mr. Kimoto filed "Defendant's Motion to Reconsider Motion for a Judgment of Acquittal and Motion for a New Trial," on August 12, 2008. The district court believed this argument was an attempt to circumvent the requirement, set forth in Federal Rule of Criminal Procedure 33(b)(2), that motions for a new trial be filed within seven days. The court had a sound basis for that view. We would add that Mr. Kimoto bears the responsibility for his own failure to secure complete discovery and to review thoroughly that material. It was Mr. Kimoto's decision—or that of his counsel—to commence the review of the extensive documentary and digital evidence only a few weeks before trial. It also was his decision to forego a motion to continue that would have allowed his defense team additional time to review and understand the original digital evidence sent to Libby on March 28, 2008. The district court correctly determined that it was these decisions, rather than any Government attempts at subterfuge, that has resulted in any prejudice to Mr. Kimoto.

### 3. Customer Service Records

Mr. Kimoto maintains that hundreds of thousands of customer service complaints seized from SOS were lost or destroyed by the Government. Mr. Kimoto further submits that these records were material because they were "[c]entral" to his theory that "the great majority of the customer service calls received by SOS and BABC were not complaints by consumers claiming to have been misled into believing that they would receive a credit card." Appellant's Br. 33. Mr. Kimoto acknowledges that 6,366 SOS customer inquiry records were included in the Government's documents and made available to him and that he was able to establish that, of those 6,366 records, "only 22 identified that the caller had complained that he believed the product to be a credit card." *Id.* at 34. Nevertheless, he claims "[c]omplete access to the database would have permitted this point to be made with considerably more force." *Id.* at 35.

We agree with the district court that, under the circumstances presented here, the *alleged* loss or destruction of documents by the Government does not constitute a due process violation. First, we note that the district court found that, as a threshold matter, Mr. Kimoto did not establish that the Government destroyed or lost the documents in question. *See supra* pp. 38-39. Mr. Kimoto asserts that "[t]here can be no doubt that these records existed and were seized." Appellant's Br. 33. However, he has not pointed to the testimony of any witness which calls into question the district court's conclusion that there is no evidence that 800,000 customer com-

plaints existed in hard copy at the time the Government raided SOS offices or that, if they did exist, the Government actually took possession of them. *See* R.72 at 14. Furthermore, assuming both the existence and destruction (and/or loss) of the documents, Mr. Kimoto has not established that "the evidence was of such a nature that [he] would be unable to obtain comparable evidence by other reasonably available means." *Hubanks*, 392 F.3d at 931. There were over six thousand customer records from SOS that were in the Government's possession and were turned over to Mr. Kimoto. Mr. Kimoto concedes that the documents were available to him and that they provided him a basis for arguing that customers were not confused as to what they were purchasing. Specifically, Mr. Kimoto's counsel stated during closing argument:

> Now there ha[s] been a lot of testimony concerning complaints and the nature of the complaints. . . . Memories change, especially when they are being pressed. Documents don't. The complaints are in black and white. They don't change their stories. As you recall, there is [sic] approximately 6,400 of them. Of that 6,400, there were only 22 complaints from people saying that they thought they were getting a credit card. That is less than one half of one percent. That happens. There is [sic] occasionally bad agents that are on the phone and get away with it.

Tr. IX at 55. Here, the Government's alleged loss or destruction of SOS customer service records did not prevent Mr. Kimoto from arguing that consumers

were not confused by the sales pitch; his point simply could have been made with "more force" had the additional documents been available to him.[30]

---

[30] Mr. Kimoto also maintains that the Government used the SOS customer service records at sentencing to calculate the loss for which Mr. Kimoto was responsible. *See* Appellant's Br. 36. He contends that the Government's use of these documents not only establishes that the Government has been disingenuous about their existence, but the use of the documents at sentencing constitutes a separate *Brady* violation. The Government did not employ any customer service records during sentencing. Postal Inspector Latham testified that he used a database of identifiable victims that had been compiled by the FTC; this database contained only the names and addresses of victims. The sources for the database do not appear in the record; however, given that the database only contains victim names and addresses, it could have been the VoiceLog recordings or information provided by Global e-Telecom, *see* Sent. Tr. at 35-36, both of which were available to the defense. Postal Inspector Latham also testified that, to compose a similar database for BABC-related victims, he used a database recovered from one of Assail's computers; again, this information was available to the defense. Moreover, all of this information was entered as evidence at the sentencing hearing *without objection* by the defense. *See* Sent. Tr. at 41.

There is one additional claim concerning the customer service records that Mr. Kimoto mentions only in passing in his briefs before us, but which he pursued more thoroughly before the district court: When executing search warrants, Government agents destroyed computer links between Assail and SOS, rendering digital evidence stored at SOS inaccessible.

(continued...)

In sum, we agree with the district court that Mr. Kimoto has failed to show either that the Government destroyed any SOS documents or that other comparable documents were not available to him. The district court, therefore, did not abuse its discretion in determining that there were no violations of *Brady* or *Youngblood* with respect to the SOS customer complaints.

### 4. Howard's E-mail

Mr. Kimoto next submits that he was prejudiced by the Government's failure to turn over e-mails referenced in a deposition of James Sierra. Sierra and Howard were co-owners of Apex, a company that supplied debit cards to Assail. In Sierra's deposition in the FTC action, to which Mr. Kimoto initially was a party, counsel for the FTC referenced several e-mails sent or received by employees of Apex. One of those e-mails was from Howard's e-mail account and stated that "no fulfillment is paramount [sic] to wire fraud." R.154, Ex. 3 at 143-44.

---

[30] (...continued)

As set forth previously, *see supra* note 26, the district court concluded that Libby's testimony established that there was no intentional destruction of evidence by the Government and that the manner in which the Government conducted its searches did not evidence bad faith. The district court employed the correct standard in reviewing Mr. Kimoto's claim and supported its finding with evidence from Mr. Kimoto's own expert. Its holding on this issue, therefore, was not an abuse of discretion.

The Government produced the Sierra deposition to Mr. Kimoto before trial.[31] Sierra was not called as a witness, but, when the Government called Howard, Mr. Kimoto's counsel objected on the ground that the e-mail, referenced above, was not provided as required by the Jencks Act. The district court overruled the objection. When the issue was raised in subsequent filings with the court, the court addressed Mr. Kimoto's withholding claim under both the Jencks Act and *Brady*.[32] The court determined that the document was available to Mr. Kimoto through other means and that Mr. Kimoto suffered no prejudice as a result of any withholding.

On appeal, the Government argues, inter alia, that the e-mail at issue is not a statement within the Jencks Act. We agree. The Jencks Act defines statement as follows:

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

---

[31] The record does not reflect when the transcript of the deposition was turned over to the defense.

[32] The court initially characterized Mr. Kimoto's argument concerning the Howard e-mail as more appropriately analyzed under *Brady*. However, Mr. Kimoto argued in his motion to reconsider that the court should have considered this to be a Jencks Act claim. The district court did so, but similarly rejected the argument.

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).[33] In *United States v. Sopher*, 362 F.2d 523 (7th Cir. 1966), we further have explained that the term "statement" as used in § 3500(e) refers to

a recorded recital of past occurrences made by a prospective prosecution witness. From its very nature, necessarily it is made after those events have taken place. If a prosecutor, in reliance on the statement, uses as a witness the maker thereof as a part of the government's case, the statement must be produced for the use of defense counsel.

*Id.* at 525. Thus, in *Sopher*, we held that the Jencks Act did not require the Government to turn over the transcript of a conversation, recorded by a cooperating witness, during which the defendant accepted a bribe. In contrast to a witness's recollection of past events, *Sopher* involved "a concurrent tape recording of a conversation

---

[33] Although not spelled out in any detail, Mr. Kimoto presumably is arguing that Howard's e-mails fall within subsection (e)(1).

between the payer and the recipient of an alleged cash bribe," which "[wa]s obviously of contemporaneous sounds." *Id.* We continued:

> The result is a preservation of a conversation just as it was spoken. It is direct evidence relevant on the issue of the alleged guilt of the defendants on trial. Made when the allegedly extorted bribe money was being paid, the tape recording in this case is of the actual voices of the briber and the bribee. It is therefore not a recital of a past occurrence by a prospective witness and is not within the general purview of § 3500.

*Id.*; *see also United States v. Skillman*, 442 F.2d 542, 553-54 (8th Cir. 1971) (same). Mr. Kimoto does not seek to distinguish *Sopher*, nor does he offer any authority suggesting a different definition of "statement" should apply.

We agree with the district court that Mr. Kimoto's claim with respect to the Howard e-mails is better addressed under *Brady*. However, even under this approach, Mr. Kimoto's claim fares no better. First, in the district court, Mr. Kimoto explicitly disclaimed any reliance on *Brady* as the basis for seeking Howard's e-mails. *See* R.88 at 11 ("The Court wrongly classified the demand for emails as a *Brady* issue as opposed to one raising rights guaranteed by the Jencks Act."). Second, even if we look to the merits of Mr. Kimoto's *Brady* claim, it must fail because Howard's e-mails were neither "suppressed" nor "material." In *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005), we explained that "[e]vidence

is 'suppressed' for *Brady* purposes when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."

Mr. Kimoto argues that the deposition was not available to him because he "had settled the FTC litigation months before the Sierra deposition was taken, w[as] not present for the deposition, and never received that discovery." Reply Br. 12. Nothing in this statement, however, dispels the notion that, in the exercise of reasonable diligence, Mr. Kimoto could have obtained the document. He does not claim that he did not receive notice of the Sierra deposition, nor does he claim that he was not monitoring the FTC litigation or that he could not have procured the documents from his co-defendants in that action. Indeed, although Mr. Kimoto had entered the stipulated judgment by the time that Sierra was deposed, that judgment anticipated Mr. Kimoto's continued cooperation with the court-appointed receiver and provided for the court's retention of jurisdiction for purposes of construction, modification and enforcement of the judgment. The court records reflect that, long after the stipulated judgment was entered, Mr. Kimoto was deposed in the FTC action and also litigated the FTC's motion to lift the previously suspended portion of the judgment against him. Given Mr. Kimoto's continued involvement in the FTC action at the time that Sierra's deposition was taken, we believe that the deposition was available to him in the exercise of reasonable diligence.

Finally, we cannot conclude that the one e-mail attributed to Howard was "material" for *Brady* purposes. The Supreme Court has explained that evidence is material for purposes of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (internal quotations marks and citations omitted). In this case, the defense extensively cross-examined Howard on his actions, his relationship with Assail and Mr. Kimoto, and his criminal background. Given that the jury already was aware of Howard's criminal history, we do not believe that an e-mail suggesting that he was engaging in actions tantamount to wire fraud would have affected the jury's decision to accept or reject his testimony.[34]

In sum, we do not believe that any of the district court's rulings on the alleged *Brady*, *Youngblood* or Jencks Act violations constitutes an abuse of discretion. There was no error, therefore, in denying Mr. Kimoto's motion to dismiss, motion for a new trial and motion to reconsider on those bases.

---

[34] Even if we had determined that the Government had suppressed the Porcelli e-mails and the SOS records, the cumulative effect of this evidence would not have risen to the level of *Brady* materiality. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). There was substantial testimonial and documentary evidence to establish that Mr. Kimoto was instrumental in marketing debit cards in a deceptive manner, did so with an intent to deceive, and joined with others to accomplish his goals.

## IV

## SENTENCING

Mr. Kimoto challenges two aspects of his sentencing: the enhancement for the loss calculation and the enhancement for the number of victims. According to Mr. Kimoto, "[a] finding that any customer suffered a loss that could be included under § 2b1.1 depends on whether the customer paid money 'as a result of' a mistaken belief caused by the defendant's misrepresentation." Appellant's Br. 49. Because, continues Mr. Kimoto, at least some customers understood that they were receiving a debit card, as opposed to a credit card, the district court's calculation, which assumed that all individuals who paid the fee were victims, greatly overestimated both the number of victims as well as the total loss.

The Government counters that loss, for purposes of § 2B1.1, is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Furthermore, the application notes clearly require the district court only to "make a reasonable estimate of the loss" based upon the "available evidence." *Id.* at n.3(C). Because the district court's estimate of actual loss is much less than the intended loss, continues the Government, any error in the calculation of actual loss is harmless.

Mr. Kimoto acknowledges that intended loss is an alternative method of calculating loss for purposes of the Guidelines. However, he maintains that, even if the district court had adopted an "intended loss" rationale, as opposed to an actual loss proposed by the Government, the Government still had to establish that Mr. "Kimoto had

intended to <u>cause</u> the loss the District Court used in its Guidelines calculations." Reply Br. 23.

We review a trial court's calculation of the loss caused by defendant's fraudulent conduct for clear error. *United States v. Peterson-Knox*, 471 F.3d 816, 821-22 (7th Cir. 2006). A defendant challenging a district court's loss calculation must not only demonstrate that it is inaccurate, but also "outside the realm of permissible computations." *Id.* at 822. In conducting our review, we turn first to the applicable guideline and the district court's application of that guideline to Mr. Kimoto.

## A. District Court's Guideline Calculation

Section 2B1.1 is the guideline applicable to Mr. Kimoto's offenses. Section 2B1.1 instructs the district court to use a base offense level and to increase the offense level according to the amount of "loss." Application note 3 gives further instruction on how to calculate "loss" for purposes of that guideline; it states that the "general rule" is that "loss is the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). It further provides that "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense" and "intended loss" is the "pecuniary harm that was intended to result from the offense." *Id.* at n.3(A)(i) & (ii).[35]

---

[35] Application note 3 provides in relevant part:

    3.   Loss Under Subsection (b)(1).--This application note applies to the determination of loss under sub-
(continued...)

Here, in calculating the number of victims and the estimated loss, the district court adopted the figures compiled in the second addendum to the Presentence

---

[35] (...continued)

       section (b)(1).

   (A)  General Rule.--Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

      (i)   Actual Loss.--"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

      (ii)  Intended Loss.--"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

      (iii) Pecuniary Harm.--"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

      (iv) Reasonably Foreseeable Pecuniary Harm.--For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

U.S.S.G. § 2B1.1 cmt. n.3.

Report ("PSR"). According to the addendum, loss was estimated at approximately $39 million. This figure represents the total amount of funds debited from individual accounts in response to Assail's telemarketing calls, less refunds issued. Accordingly, Mr. Kimoto's sentence was increased twenty-two levels. *See id.* § 2B1.1(b)(1)(L) (instructing that offense levels should be increased by twenty-two for losses of greater than $20 million). Additionally, the addendum estimated over 500,000 victims of Mr. Kimoto's scheme. This number represents the number of individuals whose accounts were debited in response to Assail's tele-marketing calls. Because the number of victims exceeded 250, Mr. Kimoto's offense level was increased by six levels. *See id.* § 2B1.1(b)(2)(C). With additional adjustments not at issue on this appeal, Mr. Kimoto's offense level was calculated at 45, which was treated as an offense level of 43—the highest offense level set forth on the sentencing table. An offense level of 43, re-gardless of a defendant's criminal history level, results in a recommended sentence of life imprisonment.

After accepting the sentencing calculation set forth in the PSR, the court then determined that, although Mr. Kimoto had committed "an extremely serious of-fense," a life sentence was "simply unreasonable in [its] view." Sent. Tr. 138. Accordingly, the court sentenced Mr. Kimoto to 350 months' imprisonment. The court explained:

> In this case I am going to sentence him . . . to a term on Counts 1 through 14 of 25 months per count to be served consecutively and not concurrently. This is an

effective sentence of 350 months. . . . 350 months times 85 percent, assuming he gets credit for good time, is 297 months. That is about 25 years, which is roughly half of his life expectancy. So he would get out roughly at age 58. It is [a] long sentence, substantially less than [a] life sentence, but is a sentence, in my view, that meets all of the requirements of 18[] U.S.C. Section 3553(a) and is not greater than necessary to comply with the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

Sent. Tr. 148.

## B. Estimate of Loss

In challenging the district court's estimation of loss before this court, Mr. Kimoto does not dispute the accuracy of the raw numbers used by the district court. That is, he does not dispute that Assail took in at least $39 million from the sale of its products. Instead, Mr. Kimoto maintains that, because of the necessity of establishing causation, this payment figure is not the equivalent of loss.

Although there is no question that the sale of Assail's debit card generated the sum employed by the district court, there is evidence in the record that not every individual who authorized the $159 debit of his account was deceived by Assail's sales pitch; there were at least

some who understood that they would be receiving a debit card. *See* Sent. Tr. 53-55. The district court acknowledged that there may have been some individuals who knew what they were getting; however, because the raw numbers of individuals and amount of funds were so great, it believed that the elimination of those few individuals from consideration would not affect Mr. Kimoto's sentencing calculation. *Id.* at 55.

If we had to rely on the district court's actual loss calculation, we might be compelled to remand for a more considered estimation of the number of individuals who were not deceived and, as a result, a more definitive determination that the sentencing calculation would not have been affected. However, this step is unnecessary. As referenced previously, the commentary to U.S.S.G. § 2B1.1 required the district court to apply the "greater of" actual or intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A).

If we apply an intended loss figure, it is clear that the amount of actual loss pales by comparison.[36] Defense counsel represented to the court that Mr. Kimoto pur-

---

[36] Mr. Kimoto believes that the Government's reliance on "intended" as opposed to "actual" loss "comes too late," Reply Br. 22; he stops short, however, of arguing that the reliance on intended loss has been waived. Our own review of the record reveals that, while at the district court, the Government raised intended loss as an alternative to actual loss in its response to Mr. Kimoto's objections to the PSR and presented evidence in support of an intended loss calculation during the sentencing hearing. *See* Sent. Tr. 74-80.

chased lead lists of potential customers consisting of approximately 50,000,000 names. It would be inappropriate to use this number to estimate intended loss, however, because testimony also established that telemarketers anticipate only a small percentage of positive responses from a lead list; specifically, an "excellent list" would yield a two-percent return, whereas an average rate for return would yield a one-percent return. Sent. Tr. 76-80.[37] If, in estimating intended loss, the court employed only an average rate of return (one percent) and the lowest of the prices at which an Assail card was offered ($159), the district court would have arrived at an intended loss figure of $79,500,000. An intended loss of this amount corresponds to an offense-level enhancement of 24, as opposed to the enhancement of 22 levels received by Mr. Kimoto. An even more modest rate of return of one-half of one percent yields an intended loss of $39,750,000, which is very close to the number employed by the district court for actual loss and which also corresponds

---

[37] Mr. Kimoto's claim that the Government failed to show that he "intended to cause the loss" related to this number of consumers is without merit. Reply Br. 23. The record is replete with evidence that Mr. Kimoto wanted to convince every potential purchaser that what he or she was purchasing was a credit card. As set forth in the application note, the fact that some prospective purchasers did not want the card, could not purchase the card, or were not fooled does not affect Mr. Kimoto's intent. See U.S.S.G. § 2B1.1 cmt. n.3(A) (stating that loss "includes intended pecuniary harm that would have been impossible or unlikely to occur").

to an enhancement of 22 levels—the one actually received by Mr. Kimoto.[38]

## C. Enhancement for Number of Victims

We cannot, however, apply the same rationale to the district court's offense-level enhancement for number of victims. Section 2B1.1 defines "victim" accordingly:

> "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

U.S.S.G. § 2B1.1 definitions. In other words, whereas the loss calculation can be based on either actual or intended loss, the estimation of the number of victims is limited to those who incurred part of the actual loss.

Here, the PSR (adopted by the court) considered all purchasers, well over 500,000, to be victims. It did not estimate how many of these individuals purchased

---

[38] Any criticism that this method of ascertaining loss is too speculative is irrelevant in this case. As noted above, the figure used by the district court represented individuals who actually responded to Assail's call and actually spent money on its product. Mr. Kimoto, therefore, was given the benefit of the doubt by being sentenced as if he intended a loss based on actual sales—regardless of whether his scheme anticipated a greater number of purchasers and a greater return.

Assail's products as a result of Assail's deceptive sales efforts.

There is evidence in the record from which the district court could have reached a reasonable estimate of victims, specifically, the customer service records from SOS, the testimony of Lankford and of Porcelli during trial, as well as the testimony of Kristen Davis at sentencing. We are skeptical that, after review of this evidence, the district court reasonably could conclude that there were less than 251 individuals who suffered actual loss. However, that is a determination for the district court to make in the first instance.

Because the district court's calculation of the number of victims did not focus on actual loss, and because that enhancement affects Mr. Kimoto's sentencing range, we remand to the district court for a more definite calculation of the number of victims. If the district court, after review of the record and based on a reasonable estimate, concludes that the number of victims exceeds 250, then the original sentence shall stand. If, however, the court concludes that the number of victims does not exceed 250, then it must reevaluate its enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C). We emphasize that this is a very limited remand, confined to the calculation of the number of victims for purposes of § 2B1.1(b)(2)(C); no other aspects of Mr. Kimoto's sentencing should be revisited.

## Conclusion

For the foregoing reasons, the judgment of the district court with respect to Mr. Kimoto's conviction is affirmed. Additionally, we affirm all aspects of Mr. Kimoto's sentencing with the exception of the calculation of victims under U.S.S.G. § 2B1.1(b)(2)(C). We remand that aspect of Mr. Kimoto's sentence to the district court for further findings concerning the number of victims. In every other respect, the judgment of the district court is affirmed.

AFFIRMED in part; REMANDED in part